# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-1733

_____

| | | |
|---|---|---|
| Micheal Specht, Mark Donelan, Mark Egger, James Haiar, Bo Mortensen, Jim Powers, Jason Schiebout, Grant Van Riesen, Trent Boe, Bob Dykstra, Rocky Foster, Jon Kolba, Wade Mulder, Nathan Ruml, Bob Vosburg, and Scott Schiltz, | * * * * * * * * | |
| Appellants, | * * | Appeal from the United States District Court for the District of South Dakota. |
| v. | * * | |
| The City of Sioux Falls, | * * | |
| Appellee. | * | |

_____

Submitted: November 17, 2010
Filed: May 11, 2011

_____

Before SMITH, BEAM, and BENTON, Circuit Judges.

_____

SMITH, Circuit Judge.

Firefighter Michael Specht of the City of Sioux Falls's Fire Rescue Department (SFFR) and 15 other SFFR firefighters filed suit against the City of Sioux Falls ("the City"), seeking overtime compensation under the Fair Labor Standards Act (FLSA) for work performed at the request of the State of South Dakota ("the State") to help

fight wildfires in western South Dakota and Nebraska. The district court[1] granted summary judgment to the City, finding that the special detail exemption of the FLSA, 29 U.S.C. § 207(p)(1), applied because (1) the City firefighters volunteered for the State firefighting assignment and (2) the State and the City are separate and independent employers; as a result, the hours that the firefighters worked for the State are not combined with the hours worked for the City for purposes of overtime compensation. We now reverse.

## I. *Background*

In July 2006, Ricky Larsen, Chief of SFFR, received a call from the State fire dispatch requesting assistance in battling wildfires. The City provides wildland firefighting services to the State pursuant to the State of South Dakota Fire Suppression Agreement ("the Agreement"). The Agreement, which refers to the City as "CONTRACTOR," provides, in relevant part, that the

> City/CONTRACTOR must be reimbursed for all wage expenses it incurs (*including all overtime and backfill wages*) in order to address city budgetary concerns (*resulting from city's independent contractual obligations to its firefighters*) and has determined that it will not provide personnel unless this agreement is in effect. State agrees to pay such sums solely as a result of city's demand for such payments *and is not a party to any union contract or other employment arrangements between city and its employees*.

(Emphasis added.) It also provides that the State agrees to compensate the City "for personnel and equipment provided to the Wildland Fire Coordinator at his request," and the City agrees to, *inter alia*, "guarantee to the State of South Dakota that all liability insurance and workmen's compensation benefits available to firefighters and equipment of the CONTRACTOR is in full force and provides coverage to the persons

---

[1]The parties consented to have a United States magistrate judge preside pursuant to 28 U.S.C. § 636(c).

and equipment provided to the STATE under the terms of this agreement." According to the Agreement, the City "agrees to indemnify and hold the State of South Dakota, its officers, agents and employees, harmless from and against any and all actions, suits, damages, liability or other proceedings that may arise as a result of performing services hereunder."

As to clothing and safety equipment, the Agreement states that "[t]he Contractor [City] shall ensure that all firefighters have the [enumerated] fire safety clothing and personal fire fighting equipment when responding to a fire . . . ." With respect to personnel, the State agrees to compensate the City "for personnel according to the function they fill on an incident." The City must provide the State "with a list of employees holding current red cards and will specify the base hourly rate of salary for each of such employees." The compensation provision of the Agreement provides as follows:

> When the Wildland Fire Coordinator directs forces dispatched under this agreement to a fire, the contractor responding shall be compensated from the time and point of dispatch at the rates set forth in the Interagency Incident Business Management Handbook for the Rocky Mountain/Great Basin Coordinating Groups as amended by Interim Directive No. 5109.34-2005-1 and any subsequent amendments thereto until the time of release from services to the Wildland Fire Coordinator. The STATE will apply the version of regional rates which are in effect at the time of dispatch except that all guaranteed minimums in the Handbook are excluded from application to this agreement and specific rates set forth herein supersede regional rates. However, [t]he CONTRACTOR will be fully reimbursed for all wage expenses it actually incurs as a result of *its personnel* assisting the Wildland Fire Coordinator *including all overtime and backfill wages*. In computing the total costs of personnel wages owed to the city, the State will receive credit for any wages paid in conjunction with equipment rates. Hourly compensation for CONTRACTOR'S personnel assigned to a fire in conjunction with equipment will be deducted from the equipment rate to prevent duplicate

compensation for personnel, when equipment rates include a specified number of personnel.

(Emphasis added.) The State also agrees that "[r]eimbursement of lodging and meals for *Contractor personnel* will be based on per-diem rates and rules established for the State of South Dakota. As to "Compensation Rates for *Contractor Personnel*," the State will compensate the City "for personnel at the rates" set forth in a designated handbook. (Emphasis added.)

After receiving the call from the State, Larsen asked Division Chief Corky Miles to find volunteers to go on the deployment. The department maintained a list of SFFR firefighters who were wildland firefighter certified, as wildland certification is not mandatory for the SFFR firefighters. Specht, an SFFR firefighter, described the procedure for calling the list. The list begins with the person who has the fewest number of hours. If this individual is unavailable when called, the caller leaves a message and waits five minutes for a response. If no response, the caller proceeds to the next person on the list. Once the calling list is exhausted and there are still insufficient volunteer firefighters, the Chief may call and require participation of available employees.

Article 34, § 4 of the collective bargaining agreement between the City and the SFFR firefighters provides that "[t]he City retains the right to require an employee to work extra duty after making a reasonable effort to obtain a qualified volunteer."

On July 28, 2006, SFFR firefighters were contacted about volunteering for the deployment. The Emergency Recall Personnel Forms reflect that, in response to the call, several of the firefighters said "yes" to the deployment and several said "no."[2]

---

[2]The Emergency Recall Personnel Forms reflect that 27 firefighters were contacted. Nine firefighters said "yes," while nine said "no." Nine firefighters did not answer.

-4-

The list was not called a second time. Ultimately, six firefighters—Specht, Jim Powers, Bob Vosburg, Wade Mulder, Grant Van Riesen, and Trent Boe—were initially deployed to Rapid City, South Dakota, to assist in battling the East Ridge fire in the Black Hills.

When Specht reported to headquarters for the deployment, Miles gave him a SFFR credit card. Specht asked Miles which battalion chief he should call with recorded work times. Miles responded that the firefighters need not call in times on a daily basis and need not fill out timesheets for their normal shift days because they were going to be credited for their full 24-hour normal shifts and would settle overtime when they returned. According to Miles, the firefighters need only complete timesheets for hours actually worked during their normal off-shift days. Specht was instructed to fill out the Weekly Time Sheet (WTS) for time outside of his 24-hour shift.[3] Also during deployment, the firefighters had to fill out the South Dakota Fire Department Crew/Equipment Time Report (CTR); this form is used for billing purposes to ensure that the State reimbursed SFFR. According to SFFR's Standard Operating Procedures 810.1, the firefighters were to record all on-shift time on the CTR.[4]

The firefighters left Sioux Falls without sufficient safety equipment. Thus, while on assignment, they had to either borrow or purchase the equipment. After they

---

[3]According to Specht, a shift employee does not record his regularly scheduled 24-hour shift on the WTS because those hours automatically appear on TeleStaff, the computer software.

[4]"On-shift time is defined as traveling to and from the point of hire and related waiting time, and other travel necessary for the performance of work, such as from fire camp to fire line or between fire camps, while staged, and actual work." "Off-shift time is non-compensable," and it "consists of time for sleeping, resting, or eating when a person or crew is free from assigned duties, or when equipment is broken down or inoperable."

arrived in Rapid City, the firefighters were diverted to Chadron, Nebraska, to assist in fighting the Dawes County Complex fires. On August 4, 2006, the firefighters left Chadron and returned to Rapid City to assist in fighting the White Owl, South Dakota fire. On August 5, 2006, there was a crew rotation, with John Kolba, Rocky Foster, and Scott Schiltz replacing Powers, Van Riesen, and Boe. Powers took the WTS's for the week of July 30, 2006, and the CTR's for the Dawes Complex to Sioux Falls. Another crew rotation occurred on August 9, 2006, with Mark Donelan, Bob Dykstra, and Nathan Ruml replacing Specht, Vosburg, and Mulder. Specht turned in the remaining WTS's and CTR's when he returned to Sioux Falls.

On August 12, 2006, Specht returned to his regularly scheduled shift in Sioux Falls. He reviewed TeleStaff, the computer software, for the shifts occurring while he was deployed. The records reflected hours worked for the entire regular shift, in addition to the time recorded on the WTS's. On August 17, 2006, Specht printed copies of TeleStaff records showing that he was going to get paid for each of his normal 24-hour shifts during the time that he was deployed. Thereafter, SFFR Clerk Cindy Konda informed Specht that Larson told her to change the way that the hours were counted. Specht responded that Konda should talk with the employees before changing the hours because the employees' understanding, per Miles's direction, was that they were already "on the clock" during their normal shifts, meaning that there would be hours of work that did not show up in the CTR's or WTS's.

On August 18, 2006, Specht received his pay statement showing that he had been paid $2,001.19 in overtime pay, which was equal to 59.5 hours of overtime. His pay cycle had ended on August 12, 2006—the day before the end of the pay period. The WTS's that he had submitted for the weeks ending July 30, August 6, and August 13 reflected that he had worked 141.5 hours in addition to his regular shifts—82 hours more than that reflected in his pay statement.

On August 19, 2006, Specht noticed that the hours recorded on TeleStaff had been altered, and he subsequently notified Konda. According to Konda, Miles instructed her to amend the timesheets. A handwritten note on the time sheet says "Mike hit his 204 plus overtime so remove these hours to reduce OT."[5] On September 1, 2006, Specht received a paycheck with an additional $521.32 in overtime—the equivalent of 15.5 hours. This brought the total overtime paid to Specht to 75 hours for that pay period, or 66.5 hours less than what he submitted on the WTS's. The other SFFR firefighters received similar underpayments of overtime.

Specht brought a grievance pursuant to the collective bargaining agreement. Following a grievance hearing, the grievance was denied. Specht and 15 other SFFR firefighters filed suit against the City claiming that they were entitled to additional overtime compensation under the FLSA. The City moved for summary judgment, arguing that certain exclusions under the FLSA applied barring the firefighters from recovering the additional overtime. The district court granted summary judgment to the City, finding that the special detail exemption of the FLSA, 29 U.S.C. § 207(p)(1), applied because (1) the firefighters were on the firefighting detail solely at their own option and (2) the State and the City are separate and independent employers; as a result, the hours that the firefighters worked for the State are not combined with the hours work for the City for purposes of overtime compensation.

---

[5]The normal schedule called for the firefighters to work 204 hours during a 27-day pay period. Typically, a firefighter's deployment for wildland firefighting is not more than 14 days. There was a concern that deployed firefighters would be paid less than if they had stayed in Sioux Falls and worked the normal 204 hours work schedule. The City agreed to pay the difference between 204 hours and the hours actually worked during a 27-day period in which a firefighter was deployed if a firefighter's hours during the 27-day period totaled less than 204.

## II. *Discussion*

The SFFR firefighters assert that the district court misinterpreted the plain language of the governing regulation, 29 C.F.R. § 553.227(a), which states that the special detail exemption applies "during their off-duty hours." They also argue that the district court erred in concluding that no disputed issues of material fact remain as to whether the deployment was truly voluntary because (1) any firefighter that refused the deployment was moved to the bottom of the overtime list and (2) the City could mandate deployment if a second call of the list was made. Finally, they maintain that the district court's finding that the State constituted a separate and independent employer was erroneous. The firefighters contend that the court failed to consider the Agreement between the City and the State, the firefighters' rights under the collective bargaining agreement, the past practice of the City, and all indicia of the employer-employee relationships.

In response, the City asserts that, as a matter of law, the special detail exemption applies. First, the City argues that the undisputed evidence establishes that participation in the deployment was voluntary, evidenced by several SFFR firefighters refusing the opportunity to participate. According to the City, no evidence exists that any firefighter was ever sanctioned for refusing to participate. Second, the City contends that the undisputed evidence establishes that the firefighters were employed by the State, not the City, because it was the State that directed and controlled how the firefighters performed their work during the deployment and because the deployment primarily benefitted the State.

"We review de novo the district court's summary judgment order, using the same standard the district court used." *Yon v. Principal Life Ins. Co.*, 605 F.3d 505, 509 (8th Cir. 2010). A district court appropriately grants summary judgment "when no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law." *Id*.

-8-

"The FLSA generally requires that all employers compensate their employees at the rate of one and one-half times their normal hourly rate for all hours worked in excess of a 40-hour week." *Benshoff v. City of Va. Beach*, 180 F.3d 136, 140 (4th Cir. 1999) (citing 29 U.S.C. § 207(a)(1)). The purpose of the FLSA "is to protect the rights of those who toil, of those who sacrifice a full measure of their freedom and talents to the use and profit of others." *Id*. (quotation and citation omitted). Courts should broadly interpret and apply the FLSA to effectuate its goals because it is "remedial and humanitarian in purpose." *Id*. (quotation and citations omitted).

"Those seeking compensation under the Act bear the initial burden of proving that an employer-employee relationship exists and that the activities in question constitute employment for purposes of the Act." *Id*. After this burden is satisfied, "the employer bears the burden of proving entitlement to any exemptions or exceptions to the Act's compensation requirements." *Id*. "When an employer contends it is exempt from the Act, the employer has the burden of establishing the exemption clearly and affirmatively." *Reich v. ConAgra, Inc.*, 987 F.2d 1357, 1360 (8th Cir. 1993) (internal quotations, alteration, and citations omitted). Thus, the City bears the burden of proving that the special detail exemption applies.

Section 207(p)(1) of 29 U.S.C., the special detail exemption of the FLSA, provides as follows:

> (1) If an individual who is employed by a State, political subdivision of a State, or an interstate governmental agency in fire protection or law enforcement activities (including activities of security personnel in correctional institutions) and who, *solely at such individual's option*, agrees to be employed on a special detail by a *separate or independent employer in fire protection*, law enforcement, or related activities, the hours such individual was employed by such separate and independent employer *shall be excluded* by the public agency employing such individual in the calculation of the hours for which the employee is

entitled to overtime compensation under this section if the public agency—

> (A) requires that its employees engaged in fire protection, law enforcement, or security activities be hired by a separate and independent employer to perform the special detail,

> (B) facilitates the employment of such employees by a separate and independent employer, or

> (C) otherwise affects the condition of employment of such employees by a separate and independent employer.

(Emphasis added.) In turn, 29 C.F.R. § 553.227 provides, in relevant part:

> (a) Section 7(p)(1) makes special provision for fire protection and law enforcement employees of public agencies who, at their own option, perform special duty work in fire protection, law enforcement or related activities for a separate and independent employer (public or private) during their off-duty hours. The hours of work for the separate and independent employer are not combined with the hours worked for the primary public agency employer for purposes of overtime compensation.

> (b) Section 7(p)(1) applies to such outside employment provided (1) The special detail work is performed solely at the employee's option, and (2) the two employers are in fact separate and independent.

> (c) Whether two employers are, in fact, separate and independent can only be determined on a case-by-case basis.

### A. *Voluntary*

Section 207(p)(1) provides that the special detail exemption only applies if the employee "solely at such individual's option, agrees to be employed on a special detail by a separate or independent employer in fire protection." *See also* 29 C.F.R.

-10-

§ 553.227(b) ("Section 7(p)(1) applies to such outside employment provided (1) The special detail work is performed solely at the employee's option . . . .").

Here, the SFFR firefighters maintain that wildland deployment is not truly voluntary because (1) if the City must call the list a second time, it can require a firefighter's deployment; (2) a refusal of deployment moves the firefighter down on the overtime list; and (3) firefighters can be forced to report in the event of emergencies. But the undisputed evidence reflects that several of the firefighters chose *not* to accept the deployment. As the district court noted, the firefighters "had the option to say, 'no, I won't go,' or 'yes' on the first time [that] the list was called." *Specht v. City of Sioux Falls*, No. CIV. 08-4124, 2010 WL 759014, at *6 (D.S.D. Feb. 26, 2010). The potential forcing of some firefighters to accept the assignment under hypothetically different circumstances does not negate the voluntary acceptance of these firefighters applying the given facts. "[W]e do not decide hypothetical cases." *United States v. Karger*, 439 F.2d 1108, 1110 (1st Cir. 1971).

The firefighters have failed to present evidence that those of them who said "no" to the deployment were punished or reprimanded in any way. Furthermore, the firefighters who rejected the deployment did so in spite of their refusal causing them to move down on the overtime list. Accordingly, we conclude that the voluntariness prong of § 207(p)(1) is satisfied.

B. *Employer*

For the special detail exemption to apply, the City must also establish that the firefighters "agree[d] to be employed on a special detail by a separate or independent employer in fire protection." 29 U.S.C. § 207(p)(1); *see also* 29 C.F.R. § 553.227(b) ("Section 7(p)(1) applies to such outside employment provided . . . (2) the two employers are in fact separate and independent.").

-11-

In the FLSA,

"[e]mployee" is defined by the Act as "any individual employed by an employer." 29 U.S.C. § 3(e)(1). As the Supreme Court noted in an ERISA case, this definition is "completely circular and explains nothing." *Nationwide Mutual Ins. Co. v. Darden*, 503 U.S. 318, ___, 112 S. Ct. 1344, 1348, 117 L. Ed. 2d 581 (1992). "'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). "'Employ' includes to suffer or permit to work." *Id.* at § 203(g).

*Reich*, 987 F.2d at 1360–61 n.4. The FLSA "provides little guidance in delineating the contours of the employer-employee relationship." *Id.* at 1360. The employment relationship "depends upon the circumstances of the whole activity." *Id.* at 1361 (quotation and citation omitted).

Under the FLSA, "[w]hether two employers are, in fact, separate and independent can only be determined on a case-by-case basis." 29 C.F.R. § 553.227(c). The special detail exemption still applies even if "[t]he primary employer . . . facilitate[s] the employment or affect[s] the conditions of employment of such employees." *Id.* § 553.227(d). In the present case, this means that the City "may maintain a roster of [firefighters] who wish to perform such work." *Id.* The exemption also applies even if the City "select[s] the [firefighters] for special details from a list of those wishing to participate, negotiate[s] their pay, and retain[s] a fee for administrative expenses." *Id.* The City "may require that the separate and independent employer [,purportedly the State,] pay the fee for such services directly to the [City], and establish procedures for the [firefighters] to receive their pay for the special details through the [City's] payroll system." *Id.* "Finally, the [City] may require that the [firefighters] observe their normal standards of conduct during such details and take disciplinary action against those who fail to do so." *Id.*

> In other words, under section 7(p)(1), when a public agency fire protection . . . employee is jointly employed by a separate and independent employer during the same workweek, the primary public employer would not be liable for the payment of any overtime compensation which may otherwise be due as a result of the special detail joint employment.

United States Department of Labor, Wage and Hour Division, Opinion Letter: Fair Labor Standards Act, FLSA2007-12, 2007 WL 4961210 (Dec. 31, 2007).

Here, the SFFR firefighters do not contest that the City and State are separate and independent entities[6]; thus, we need only determine whether genuine issues of material fact exist regarding whether the City was actually the firefighters' employer during their deployment. *Cf. Barajas*, 87 F. Supp. 2d at 1209 (holding that genuine issue of material fact existed regarding whether housing authority created by city was separate and independent employer under FLSA in city police officers' suit to recover

---

[6]Before the district court, the firefighters' "counsel acknowledged the State and the City are separate governmental entities during argument at the hearing." *Specht*, 2010 WL 759014, at *6 n.4. By contrast, in many cases involving the special detail exemption, the issue is whether two employers are actually separate and independent from one another. *See, e.g.*, *Cox v. The Town of Poughkeepsie, N.Y.*, 209 F. Supp. 2d 319, 326 (S.D.N.Y. 2002) (holding that "employees of the Town Police Department and the Town Court are both employees of the Town" and that "two 'separate and independent' employers" do not exist); *Nolan v. City of Chi.*, 125 F. Supp. 2d 324, 335 (N.D. Ill. 2000) (holding that city, citing housing authority (CHA), and city transportation authority (CTA) were separate and independent, meaning that hours that city police officers worked in voluntary program to provide polices services to CHA and CTA were special detail work hours that the city did not have to include in calculating overtime hours); *Barajas v. Unified Gov't of Wyandotte Cnty./Kan. City*, 87 F. Supp. 2d 1201, 1209 (D. Kan. 2000) (holding that genuine issue of material fact existed regarding whether housing authority created by city was separate and independent employer under FLSA in city police officers' suit to recover overtime pay spent patrolling public housing complexes managed by housing authority).

overtime pay spent patrolling public housing complexes managed by housing authority); *Baltimore Cnty. FOP Lodge 4 v. Baltimore Cnty.*, 565 F. Supp. 2d 672, 674 (D. Md. 2008) (holding that genuine issues of material fact existed as to applicability of special detail exemption where "additional aspect of [officers'] job duties relate[d] to the preexisting practice of using county police officers to provide security during after-hours school events such as dances and athletic contests"). Put another way, we must determine whether genuine issues of material fact remain as to whether the City merely "facilitated" or "affected the condition of" the firefighters' purported employment with the State by maintaining a roster of firefighters, selecting the firefighters for special detail, negotiating their pay, receiving payment for the firefighters' services directly from the State, and establishing procedures for the firefighters to receive payment for their services, or whether the City's actions went beyond that permitted "in the guiding regulation." *Jackson v. City of San Antonio*, No. SA-03-CA-0049-RF, 2006 WL 2548545, at *6 (W.D. Tex. Aug. 31, 2006)

Here, according to Larsen's testimony, the firefighters were "under the control of the state for their work hours." Furthermore, the City maintains that the State directed the firefighters from Sioux Falls, South Dakota, to Rapid City, South Dakota; from Rapid City, South Dakota, to Chadron, Nebraska; and from Chadron, Nebraska, to Rapid City, South Dakota. These facts weigh in favor of finding that the State was actually the firefighters' employer during the deployment. However, other facts in the record support a contrary finding. These facts tend to show that the City was actually the firefighters' employer during the deployment and that its control of the firefighters went beyond activities permitted by the regulation.

First, "one way to determine if an employee was working for an 'independent and separate employer' is by asking if the work was performed during the [firefighter's] off-duty hours." *Crow v. City of Derby, Kan.*, No. 91-1267-PFK, 1992 WL 363682, at *2 (D. Kan. Nov. 13, 1992) (noting that 29 C.F.R. § 553.227(a) "refers to work performed for an independent and separate employer during the law

enforcement officer's off-duty hours"); *see also Jackson*, 2006 WL 2548545, at *5.[7] Here, the firefighters' deployments included their normal shift days and hours.[8] Thus,

---

[7]In *Jackson*, the court stated:

Specifically, although [courts] break the analysis down in different ways, all agree that where an *off-duty employer* is institutionally separate from the primary employer and also separate for purposes of each particular instance of *off-duty employment*, it is separate and independent for purposes of § 207(p)(1). Conversely, where the *off-duty employer* possesses either structural overlap (e.g., a common payroll, a common budget, a parent-child relationship) or shared interests for purposes of the *off-duty work* (e.g., a joint stake in the event being conducted), the employers are not separate and independent for purposes of § 207(p)(1).

*Id*. (emphasis added).

[8]The district court concluded that the plain language of § 207(p)(1) "did not limit the special detail exemption to off duty hours." *Specht*, 2010 WL 759014, at *7. As a result, the district court held that the plain language controlled over 29 C.F.R. § 553.227(a), which provides that § 207(p)(1)

"makes special provision for fire protection and law enforcement employees of public agencies who, at their own option, perform special duty work in fire protection, law enforcement or related activities for a separate and independent employer (public or private) during their off-duty hours."

*Id*. at *3 (quoting 29 C.F.R. § 553.227). But § 553.227(b) actually comports with the statutory language, providing that § 207(p)(1) "applies to such outside employment provided (1) The special detail work is performed solely at the employee's option, and (2) the two employers are in fact separate and independent." Therefore, we interpret the "off duty" language in § 553.227(a) as the *Crow* court did and find that it is a factor to consider in determining whether an entity was the employer for purposes of the special detail exemption. 1992 WL 363682, at *2; *see also Cox*, 209 F. Supp. 2d at 324 (stating that "Department of Labor ('DOL') regulations provide a more specific

-15-

this case is distinguishable from those cases involving officers working events after their normal shift hours for another purported employer. *See, e.g.*, *Jackson*, 2006 WL 2548545, at \*6 (holding that "none of the Officers' off-duty employers were institutionally or interest-wise related to the City" where City established that "Officers' off[-]duty engagements were limited to the following: conventions, trade shows, home and garden shows, dog shows, football games, book fairs, Spurs games, other basketball games, graduation ceremonies, and concerts"); *Nolan*, 125 F. Supp. 2d at 333, 336–37 (holding that special detail exemption applied to "[o]fficers [who] work[ed] hours in excess of the regularly scheduled duty hours in a program known as the Voluntary Special Employment Program"); *Baltimore Cnty. FOP Lodge 4*, 565 F. Supp. 2d at 674 (holding that genuine issues of material fact existed as to applicability of special detail exemption where "additional aspect of [officers'] job duties relate[d] to the preexisting practice of using county police officers to provide security during after-hours school events such as dances and athletic contests").

Second, the City admittedly agreed to pay the difference between 204 hours and the hours actually worked during a 27-day period in which a firefighter was deployed if a firefighter's hours during the 27-day period totaled less than 204.

Third, a reasonable juror could find that the Agreement between the City and State demonstrates that the City was actually the employer during the deployment. Throughout the agreement, the City is referred to as "CONTRACTOR." A "contractor" is "one who contracts to do work or provide supplies for another." Black's Law Dictionary 327 (7th ed. 1999). The Agreement provides that the State will reimburse the City for "all wage expenses it incurs," which includes "all overtime and backfill wages." The Agreement also explicitly, and tellingly, provides that the State "is not a party to any union contract or other employment arrangements between city

---

interpretation of what 'special detail work' encompasses"); *Nolan*, 125 F. Supp. 2d at 335 (same).

and *its employees*" and that the State will reimburse the City "for all wage expenses it actually incurs as a result of *its personnel* assisting the Wildland Fire Coordinator including all overtime and backfill wages. (Emphasis added.)

Thus, the Agreement specifically acknowledges that the firefighters are, in fact, the employees of the City, not the State. Elsewhere in the Agreement, the firefighters are referred to as "its [(the City's)] firefighters," "CONTRACTOR's personnel," and "Contractor personnel." And, although the firefighters in the present case had to borrow or purchase equipment for the deployment, the Agreement actually provides that "[t]he Contractor shall ensure that all firefighters have the [enumerated] fire safety clothing and personal fire fighting equipment when responding to a fire . . . ." Finally, the City guaranteed to the State in the Agreement that its "liability insurance and workmen's compensation benefits available to firefighters and equipment of the CONTRACTOR is in full force and provides coverage to the persons and equipment provided to the STATE" under the Agreement. The City also "agree[d] to indemnify and hold the State . . . harmless from and against any and all actions, suits, damages, liability or other proceedings that may arise as a result of performing services hereunder." All of these facts could be viewed as establishing that the City, not the State, was the firefighters's employer during the deployment.[9]

---

[9]In the alternative, the City maintains that the occasional and sporadic detail exemption applies because the firefighters voluntarily participated in the deployment, the wildland firefighting deployments were occasional and sporadic, and the firefighters were working in a different capacity during deployment. Section 207(p)(2) of 29 U.S.C. provides:

If an employee of a public agency which is a State, political subdivision of a State, or an interstate governmental agency undertakes, on an occasional or sporadic basis and solely at the employee's option, *part-time employment for the public agency* which is in a different capacity from any capacity in which the employee is regularly employed with the public agency, the hours such employee was employed in performing the different employment shall be excluded by the public

### III. *Conclusion*

Accordingly, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

_____

agency in the calculation of the hours for which the employee is entitled to overtime compensation under this section.

(Emphasis added.)

Because genuine issues of material fact exist as to which entity, the City or State, the firefighters were actually "employed" by, whether the City was the "public agency" for which the firefighters were engaging in "part-time employment for," as required by § 207(p)(2), is a factual issue that must be determined. The City still bears the burden on each trigger of the "occasional and sporadic" exemption under § 207(p)(2) and its implementing regulation, 29 C.F.R. § 553.30. Nothing in this footnote prevents the district court on remand from considering whether, as a matter of law, a firefighter fighting fires in the wildlands is working in "any capacity in which the employee is regularly employed," 29 U.S.C. § 207(p)(2), which would preclude application of the "occasional and sporadic" exemption.