

# SUPREME COURT OF MISSOURI
## en banc

Andro Tolentino, )
 )
 Appellant, )
 )
vs. ) No. SC93379
 )
Starwood Hotels & Resorts Worldwide, )
Inc., et al., )
Westin Hotel Management, LP, )
 )
 Respondents. )

Appeal from the Circuit Court of Jackson County
The Honorable W. Brent Powell, Judge

*Opinion issued August 19, 2014*

Andro Tolentino appeals the circuit court's grant of summary judgment in favor of Starwood Hotels & Resorts Worldwide Inc. and Westin Hotel Management L.P (collectively, "Respondents"). Tolentino filed suit pursuant to the Missouri Minimum Wage Law (MMWL), section 290.500,[1] et seq., alleging that Respondents, as his joint employer along with Giant Labor Services Inc., ("GLS"), was liable for payment of the minimum wage. The court found that there were genuine issues of material fact regarding whether Respondents were Tolentino's employer. The circuit court entered summary judgment in favor of

_____

[1]All statutory references are to RSMo Supp. 2011, unless otherwise indicated..

Respondents on grounds that Respondents adequately compensated Tolentino and that Respondents could not be liable for the alleged wage deficiency because it was caused by GLS's unforeseeable, illegal wage deductions.

As the circuit court determined, there are genuine issues of material fact precluding summary judgment on the issue of whether Respondents were Tolentino's employer. The judgment is reversed, however, because the MMWL imposes an individual statutory duty on each employer to pay the minimum wage. Therefore, if Respondents were Tolentino's employer for purposes of MMWL, GLS's illegal wage deductions do not absolve Respondents from their independent statutory duty to pay a minimum wage. The judgment is reversed, and the case is remanded.

### Facts

Starwood owns Westin Hotel Management, which operates the Westin Crown Center in Kansas City, Missouri ("Hotel"). Respondents contract with temporary staffing agencies to provide housekeepers on an as-needed basis. GLS was one of the staffing agencies that provided Hotel with housekeepers.

The contract between Respondents and GLS provided that Respondents would inform GLS how many housekeepers were needed and that GLS would provide them. Respondents paid GLS $5 for each room cleaned. GLS was responsible for paying the housekeepers in any manner that complied with applicable law. GLS paid Tolentino $3.50 per room cleaned.

In January 2008, federal law enforcement officials informed Respondents that GLS was under investigation for crimes including human trafficking, fraud in foreign labor contracting, money laundering, fraud and extortion. Over the course of approximately two years, Respondents cooperated with law enforcement in the investigation and prosecution of GLS and its owners.

In February 2008, GLS assigned Tolentino to work at Hotel as a housekeeper. In April 2008, Respondents notified GLS that they no longer wanted Tolentino to work as a housekeeper at Hotel because he failed to complete his work in a timely manner. GLS reassigned Tolentino to a different hotel.

During the pay period of April 12, 2008, through April 26, 2008 — the last pay period during which Tolentino worked at Hotel — Tolentino cleaned 122 rooms and earned $427 prior to deductions. Tolentino's net pay was $372.34 after deductions for federal and state income tax, social security, and Medicare. GLS deducted the remaining $372.34 from Tolentino's paycheck for visa fees. Tolentino's take-home pay was $0.

GLS and its owners subsequently were indicted on federal charges. Respondents never were accused of having any role in or knowledge of GLS's criminal conspiracy. Although the charges against GLS were dismissed due to lack of assets, GLS's principals were convicted of labor racketeering based in part on their withholding earned wages for visa fees. A federal court awarded Tolentino restitution in the amount of $3,150, which the criminal judgment identified as Tolentino's total loss.

On April 21, 2010, Tolentino filed a class action suit alleging that Respondents and GLS were his employers and that Respondents failed to comply with sections 290.502 and 290.505 of the MMWL. Tolentino alleged that GLS's practice of paying housekeepers based on the number of rooms cleaned, instead of hours worked, resulted in an illegal wage deficiency. Tolentino also alleged that he was deprived of minimum wage and overtime compensation because of the visa fees deducted from his paycheck.

Respondents moved for summary judgment. Respondents argued that they were not subject to MMWL liability because they were not Tolentino's employer. Respondents also asserted that, even if GLS's practice of paying its employees $3.50 per room could be attributed to them, the $427 Tolentino earned prior to deductions reflected a legal wage rate of $7.76 per hour. Finally, Respondents asserted that they could not be held liable for GLS's illegal wage deductions.

The circuit court granted Respondents' motion for summary judgment. The court concluded that genuine issues of material fact existed as to whether Respondents and GLS were Tolentino's employers. Although the court assumed that Respondents were Tolentino's employer, the court determined that Respondents were entitled to summary judgment for two reasons. First, the circuit court concluded that Respondents adequately compensated Tolentino. Second, the court determined that the only reason Tolentino did not receive the minimum wage was because of GLS's illegal deductions. The court held that even if Respondents

4

were Tolentino's employer, Respondents "cannot be held responsible for the unforeseen criminal activity committed by GLS."

Tolentino appeals the grant of summary judgment.[2] He asserts that there are genuine issues of material fact as to whether Respondents and GLS were his joint employers. Tolentino then argues that the MMWL provides that Respondents are jointly and severally liable for the payment of minimum wages regardless of GLS's illegal wage deductions. Respondents assert that they were not Tolentino's joint employer and, if they were, they cannot be held liable for GLS's illegal wage deductions.

### Standard of Review

Appellate review of summary judgment is essentially de novo. *ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc. 1993). Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Rule 74.04(c)(6). The moving party must establish an "undisputed right to judgment as a matter of law." *ITT*, 854 S.W.2d at 380. The record is reviewed in the light most favorable to Tolentino as the non-moving party. *Id*. at 376.

Respondents' liability, if any, is premised on whether they were Tolentino's employer. The analysis of whether Respondents employed Tolentino along with GLS is inherently fact intensive because it requires an assessment of the record in

---

[2] This Court has jurisdiction pursuant to Mo. Const., art. 5, sec. 10.

5

light of multiple factors. The fact intensive nature of the analysis means that the issue of joint employment is often not suitable for resolution by means of summary judgment. *See Barfield v. New York City Health & Hosp. Corp.*, 537 F.3d 132, 143-44 (2d Cir. 2008) ("Because of the fact-intensive character of a determination of joint employment, we rarely have occasion to review determinations made as a matter of law on an award of summary judgment.").

## Missouri Minimum Wage Law

The MMWL requires employers to pay their employees the minimum wage for all hours worked. An "employer" is "any person acting directly or indirectly in the interest of an employer in relation to an employee." Section 290.500(4). An "employee" is "any individual employed by an employer." Section 290.500(3).[3]

## Joint Employment

Tolentino asserts that Respondents and GLS were joint employers. The MMWL does not use or define the term "joint employer." The MMWL utilizes the term "employer." As noted, the MMWL defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an

---

[3] With respect to Tolentino's claim for overtime compensation, section 290.505.4 provides expressly that "[e]xcept as may be otherwise provided under sections 290.500 to 290.530, this section shall be interpreted in accordance with the Fair Labor Standards Act [FLSA] …." Section 290.505 – "this section" – applies to claims for overtime compensation. Further, the Missouri Department of Labor has promulgated regulations providing that except as otherwise provided by Missouri law, the interpretation and enforcement of the MMWL follows the Federal Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. section 201, *et seq*. *See* section 290.505.4; 8 C.S.R. 30-4.010(1) (2010).

employee." Section 290.500(4). The facts of this case indicate that Respondents and GLS directly or indirectly acted in one another's interest with respect to Tolentino. Respondents received cleaning services from Tolentino and GLS profited by being able to place Tolentino at Hotel. This is a situation in which both Respondents and GLS could be viewed as Tolentino's "employer" for purposes of the MMWL.[4]

In cases involving multiple alleged employers, Missouri courts have utilized several factors to ascertain whether a particular work relationship qualifies as an employer-employee relationship to which the MMWL applies. *Fields v. Advanced Health Care Mgmt. Servs., LLC*, 340 S.W.3d 648, 654 (Mo. App. 2011) (citing *Baker v. Stone County, Missouri*, 41 F. Supp. 2d 965, 979-81 (W.D. Mo. 1999); *see also Barfield,* 537 F. Supp. at 141-143),; *Conrad v. Waffle House, Inc.*, 351 S.W.3d 813 (Mo. App. 2011) (applying the test adopted in *Fields*). In *Fields*, the court of appeals utilized five factors: (1) who has the power to hire and fire the worker; (2) who supervises and controls the worker's work schedule and conditions of work; (3) who determines the rate and method of payment of the worker; (4) who maintains work records; and (5) whether the alleged employers'

---

[4] Federal courts have found joint employment when, as in this case, an employment staffing agency supplies workers to another entity. *See, eg.*, *Barfield,* 537 F. Supp. at 143-44 (hospital was joint employer of nurses supplied by an employment staffing agency); *Ansoumana v. Gristede's Operating Corp.*, 255 F. Supp. 2d 184 (S.D. N.Y. 2003) (supermarket chain was joint employer of delivery drivers supplied by an employment staffing agency).

premises and equipment were used for the plaintiff's work. *Fields*, 340 S.W.3d at 654 (citing *Baker*, 41 F. Supp. 2d at 981).

Federal courts have referred to the first four factors identified in *Fields* as "formal" factors indicating the existence of joint employment. *See,* e.g*., Barfield*, 537 F.3d at 143. Although the federal courts have employed a variety of additional "functional" factors in analyzing FLSA cases, these factors are derived from FLSA definition of the term "employ," which includes the phrase "suffer or permit to work." 29 U.S.C. § 203(g).[5] The United States Supreme Court has recognized repeatedly that the broad definition of the term "employ" utilized by the FLSA requires a broad construction of the term. *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992); *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947). The "functional" factors employed by the federal courts are premised on the FLSA's broad definition of the term "employ." The MMWL does not define the term "employ." Analysis of so-called "formal" factors indicates the existence of genuine disputes regarding material facts that preclude summary judgment. For purposes of this case, this Court will analyze Tolentino's claim with reference only to the "formal" factors identified by the federal courts.

---

[5] The functional factors include: (1) whether the alleged employer's premises and equipment were used for the plaintiffs' work; (2) whether plaintiffs shifted from one putative joint employer's premises to that of another; (3) the extent to which the work performed by plaintiffs was integral to the overall business operation; (4) whether plaintiffs' work responsibilities remained the same regardless of where they worked; (5) the degree to which the alleged employer or its agents supervised plaintiffs' work, and (6) whether plaintiffs worked exclusively or predominantly for one defendant. *Barfield*, 537 F.3d at 143; *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 72 (2d Cir. 2003).

### *Power to Hire and Fire*

The first formal factor pertains to the alleged joint employer's authority to hire and fire the worker. Respondents assert they had no authority to hire Tolentino. Respondents note that GLS initially hired Tolentino and assigned him to work at Hotel. Tolentino, however, asserts that Respondents interviewed him prior to his performing any work at Hotel to determine whether he was suitable for work at Hotel. Tolentino also asserts that, prior to commencing work at Hotel, he was required to review and sign two documents containing Westin's performance standards for housekeepers. Respondents assert that Tolentino has "embellished" the extent of the alleged interview and that the documents simply inform housekeepers of their responsibilities.

When viewed in the light most favorable to Tolentino, the record indicates that there remains a genuine factual dispute regarding Respondents' authority to hire Tolentino. If, as Tolentino alleges, he was required to interview successfully and then sign performance standards documents before commencing work at Hotel, he may be able to establish that Respondents effectively "hired" him for MMWL purposes by exercising practical control over whether he commenced work and earned wages. The issue of whether Tolentino "embellished" the extent of the alleged interview process illustrates the existence of an unresolved genuine and material factual dispute with respect to Respondent's ability to hire Tolentino.

Respondents also assert that they had no authority to fire Tolentino. Although Respondents admit they could request that GLS stop sending an

9

unsatisfactory worker, Respondents note that GLS was not required to fire that worker. This assertion begs the question as it assumes that GLS was the sole employer for purposes of the MMWL. Additionally, as Tolentino notes, Respondents directed GLS to not assign him for additional work at Hotel. If Respondents have the authority to tell GLS not to send a certain housekeeper to work at Hotel, then Respondents arguably retain the practical authority to prevent that worker, at least temporarily, from working and earning a wage. In that sense, Tolentino and similarly situated housekeepers are economically dependent on both Respondents and GLS as joint employers. The parties' differing accounts constitute a genuine factual dispute with respect to Respondents' authority to fire Tolentino.

### *Supervision and Control*

Respondents assert that they did not supervise or control Tolentino's work schedule or work conditions. Tolentino rebuts this assertion by alleging that he had to attend meetings every morning he worked at the Hotel during which he was informed of his daily assignments. Tolentino also asserts that Hotel staff enforced Respondents' cleaning standards by inspecting the rooms cleaned by Tolentino and other housekeepers and requiring housekeepers to redo any work that was determined to be deficient.

Respondents characterize this oversight as necessary quality control measures rather than control or supervision indicative of employment. This argument begs the question. While Respondents would be expected to ensure that

10

housekeepers provided by GLS performed in accordance with Hotel standards, the issue is the extent of that control and supervision.

The degree of supervision and control allegedly exerted by Respondents also distinguishes this case from three FLSA cases cited by Respondents in which federal district courts determined, by summary judgment, that cable technicians supplied to cable television providers by another company were not jointly employed by the cable television providers. *See Lawrence v. Adderley Indus., Inc.*, No. 09-2309, 2011 WL 666304 (E.D.N.Y. Feb. 11, 2011); *Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683 (D. Md. 2010); *Zampos v. W & E Commc'ns., Inc.*, 970 F.Supp.2d 794 (N.D. Ill. 2013). In each case, the technicians were responsible for installing cable in customers' homes and were supplied to the cable company pursuant to a contract with another company. The cable technicians' work involved a variety of technical tasks requiring a higher degree of skill than required for the housekeeping positions at issue in this case. The higher degree of skill and expertise is important because "the degree of skill required to perform those jobs weighs against a finding of employer status." *Lawrence,* 2011 WL 666304 at 10, (citing *Chao v. Mid-Atl. Installation Servs., Inc.*, 16 F. App'x. 104 (4th Cir. 2001)). In contrast, the housekeeping work at issue in this case, although important and valuable, is relatively simple, repetitive, and subject to a greater degree of supervision and control by the alleged joint employer.

11

The cable technician cases are further distinguishable because the alleged joint employers did not exercise significant daily supervision over the technicians' work. For instance, in *Zampos,* 970 F. Supp. 2d at 803, the court noted that "Comcast does not observe W & E technicians activities throughout the day." 970 F.Supp.2d at 803. The *Lawrence* court noted that the cable company "does not exercise any significant degree of supervision over plaintiff's or any particular technician's work." 2011 WL 666304 at *10. Finally, in *Jacobson*, the court noted that "Comcast is not responsible for the day-to-day management of the technicians . . . and does not dictate the technicians' working conditions …." 740 F. Supp. 2d at 691. Conversely, in this case, there remains a genuine factual dispute regarding the extent of respondent's supervision and control over Tolentino's work conditions.

### *Rate and Method of Payment*

Respondents assert that they had no control over the rate or method of payment to Tolentino or any other housekeeper. Respondents further note that they paid GLS, which in turn paid Tolentino. While Respondents correctly describe the flow of money, it is also true that there is evidence that Respondents determined both rate and method of payment by deciding to remit money to GLS based on how many rooms Tolentino and other housekeepers cleaned. For instance, there is evidence that Respondents not only made the decision to pay housekeepers on a per-room basis but also raised the per-room rate in response to an increase in the minimum wage. Viewed in the light most favorable to

12

Tolentino, this evidence supports a finding that Respondents retained substantial control over the rate and method of pay.

*Maintenance of Work Records*

The final "formal factor" looks to whether the alleged joint employer maintains work records. Respondents contend that they maintained no work records such as employment applications, performance reviews, benefits information and the like. Tolentino asserts that Respondents maintained time sheets and productivity records and then utilized these records in support of its decision to "fire" him from working at the Hotel. As with the other factors, there are genuine factual disputes that should not be resolved by summary judgment.

As established above, there are genuine disputes regarding the material facts necessary and relevant to analysis of the formal factors indicating joint employment. As the circuit court concluded, therefore, there are genuine, unresolved factual issues as to whether Respondents were Tolentino's joint employer.

**Unforeseen Criminal Acts of a Joint Employer**

Respondents assert that even if it is assumed that they were Tolentino's joint employer, summary judgment is appropriate because, as a matter of law, GLS's illegal wage deductions absolve Respondents from MWML liability. The circuit court agreed, finding that that the only reason Tolentino was not compensated adequately was because GLS illegally deducted visa fees from

13

Tolentino's paycheck. As a result, the trial court held that Respondents could not be held liable under the MMWL for GLS's unforeseen criminal activity.

The issue of whether illegal wage deduction by a joint employer absolves another joint employer of MMWL or FLSA liability appears to be an issue of first impression. Respondents assert that holding it liable for GLS's unforeseen criminal acts is contrary to the purpose of the MMWL and to the common law of agency and strict liability. Tolentino asserts that applying the MMWL to Respondents does not hold Respondents liable for GLS's illegal wage deductions but, instead, simply requires Respondents to comply with its independent statutory duty as a joint employer to pay a minimum wage. Tolentino is correct.

### *Purpose of the MMWL*

The primary role of courts in construing statutes is to ascertain the intent of the legislature from the statutory language give an effect to that intent. *Holtcamp v. State*, 259 S.W.3d 537, 540 (Mo. banc 2008); *see also* section 1.010 RSMo 2000 ("all acts of the general assembly, or laws, shall be liberally construed, so as to effectuate the true intent and meaning thereof"). This generally applicable rule of construction is augmented by the fact that the MMWL, like the FLSA, is a remedial statute with the purpose of ameliorating the "unequal bargaining power as between employer and employee" and to "protect the rights of those who toil, of those who sacrifice a full measure of their freedom and talents to the use and profit of others." *Specht v. City of Sioux Falls*, 639 F.3d 814, 819 (8th Cir. 2011), *citing Bensoff v. City of Virginia Beach*, 180 F.3d 136, 140 (4th Cir. 1999).

14

Remedial statutes, like the MMWL, are construed broadly to effectuate the statute's purpose. *Util. Serv. Co., Inc. v. Dep't of Labor and Indus. Relations*, 331 S.W.3d 654, 658 (Mo. banc 2011) (citing *State ex rel. LeFevre v. Stubbs*, 642 S.W.2d 103, 106 (Mo. banc 1982)). Doubts about the applicability of a remedial statute are resolved in favor of applying the statute. *Id.* Determining whether the MMWL applies to Respondents given GLS's illegal wage deductions, therefore, requires this Court to interpret the MMWL and attendant regulations broadly to effectuate the statutory purpose of ensuring that employees receive the legally mandated minimum wage.

Respondents cite *Writz v. Harrigill,* 214 F. Supp. 813, 815 (S.D. Miss. 1963) for the proposition that one purpose of minimum wage laws is to shield unsuspecting employers from liability when those employers exercise reasonable, good faith efforts to comply with the law. That may be a purpose of the FLSA, but is not the primary purpose of the MMWL. The self-evident central purpose of minimum wage laws like the FLSA and the MMWL is to ensure that employers pay employees a minimum wage. *See,* e.g., *Specht,* 639 F.3d at 819 (8th Cir. 2011) (purpose of FLSA is to protect employees). Respondents' position is inconsistent with the purpose of the statute as it places the risk of underpayment squarely on the shoulders of the employee, the very party whom the MMWL was enacted to protect.

Respondents also assert that the MMWL should be interpreted with reference to the common law of agency and strict liability. This argument is based

15

on the premise that common law principles must be used to supplement the MMWL because the statute does not address expressly the issue of whether Starwood is liable given GLS's illegal wage deductions.

The fact that the MMWL does not address expressly the precise factual situation in this case does not mean that common law agency and strict liability principles operate to insulate Respondents from an obligation to pay a minimum wage.

The threshold issue is whether Respondents can be considered to be Tolentino's "employer" pursuant to the MMWL. If Respondents are an "employer" for purposes of the MMWL, there is nothing in the statute that precludes liability for an employer based on common law agency or strict liability principles. To the contrary, the MMWL plainly obligates employers to pay a minimum wage to its employees. If Respondents are found to be Tolentino's employer along with GLS, then, it follows that Respondents are individually responsible for paying a minimum wage. This result is consistent with the remedial purposes of the statute and with persuasive federal authority holding that joint employers are jointly liable for compliance with minimum wage laws. *See Karr v. Strong Detective Agency, Inc., a Div. of Kane Servs.,* 787 F.2d 1205, 1207 (7th Cir. 1986) ("joint employers are individually responsible for compliance with

16

the FLSA"); *Donovan v. Agnew*, 712 F.2d 1509, 1511 (1ˢᵗ Cir. 1983) (joint employers are "jointly and severally liable under the FLSA for unpaid wages").[6]

Respondents' duty to pay a minimum wage was not contingent on GLS's acts or omissions. Instead, Respondents had an independent statutory duty as Tolentino's employer to pay him a minimum wage. GLS's illegal wage deductions, even if unknown or unforeseen by Respondents, do not absolve Respondents of their MMWL obligations as an employer. Even if Respondents remitted sufficient funds to GLS to enable GLS to pay the minimum wage, Respondents, if found to be Tolentino's employer, are not absolved from MMWL liability due to GLS's failure to pay a minimum wage to Tolentino.

**Conclusion**

The judgment is reversed, and the case is remanded.

_____
Richard B. Teitelman, Judge

All concur.

---

[6] Respondents' reference to strict tort liability is inapposite. The relationship between Respondents and Tolentino was contractual. There are no tort claims at issue in this case.

17