**Melvin ELY, Plaintiff,**

v.

**DOLGENCORP, LLC, Defendant.**

**No. 5:10–cv–00115–JEG–JWC.**

United States District Court,
E.D. Arkansas,
Northern Division.

Oct. 25, 2011.

Joel S. Allen, Jason R. Elliott, Melissa M. Hensley, Ronald Eugene Manthey, Morgan, Lewis & Bockius LLP, Dallas, TX, Frederick J. Lewis Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Memphis, TN, for Defendants.

C. Lance Gould, Roman Ashley Shaul, Beasley, Allen, Crow, Methvin, Portis & Miles, P.C., Montgomery, AL, for Plaintiffs.

## ORDER

JAMES E. GRITZNER, District Judge.

Now before the Court is a Motion for Summary Judgment and Motion to Strike and Objections to Evidence Offered in Opposition to Defendant's Motion for Summary Judgment, filed by Defendant Dolgencorp, LLC (Defendant or Dolgencorp or Dollar General). Plaintiff Melvin Ely (Plaintiff or Ely), previously employed by Dolgencorp as a store manager, alleges entitlement to overtime wages under the Fair Labor Standards Act (FLSA). Defendant counters that Plaintiff is exempt from said overtime compensation due to his classification as an executive employee under the FLSA regulations. No hearing was requested, and the Court finds no hearing necessary in resolving the matter. The motions are fully submitted and ready for ruling.

## I. BACKGROUND

### A. Procedural History

The present litigation originated in the United States District Court for the Northern District of Alabama as a class action. The various plaintiffs brought this action to remedy alleged violations of the wage provisions of the FLSA, seeking unpaid overtime compensation for work weeks requiring 60 to 90 hours from store managers paid on a salary basis when only a fraction of those hours were spent on managerial duties. They allege that the store managers are also entitled to liquidated damages, prejudgment interest, and attorneys fees. At the close of the collective plaintiffs' case-in-chief, the Alabama court decertified the class. This case, along with thirty-one others, was transferred to the United States District Court for the Eastern District of Arkansas on March 30, 2010. The undersigned was designated to serve in the Eastern District of Arkansas on August 25, 2010; and on August 26, 2010, these cases were reassigned to this judge for further proceedings. The parties sought an extension of case deadlines in all cases pending consideration of a motion for summary judgment to be filed in the above-entitled action, as a representative case that could provide direction to the parties in all remaining cases. Defendant then filed this Motion for Summary Judgment on June 30, 2011, asserting that it is entitled to judgment as a matter of law on the grounds of its affirmative defense that Ely was exempt from overtime compensation under the executive exemption of the FLSA. This Motion, along with Defendant's Motion to Strike evidence presented by Plaintiff in opposition to Defendant's Motion for Summary Judgment, are now at issue before this Court.

### B. Summary of Material Facts [1]

Dolgencorp is a retail concern that sells basic consumable goods in its approximate 8,500 stand-alone stores across thirty

---

1. The Court views the evidence either as un-  disputed, or in the light most favorable to the

states. Each store is run pursuant to a manual containing Dollar General's Standard Operating Procedures (SOPs). These stores are staffed with one store manager, the only salaried employee, and, ordinarily, an assistant store manager (ASM), a lead clerk, and multiple store clerks. For their services, store managers are compensated weekly on a salary basis, with the prospect of earning performance-based, or team-share, bonuses.[2] The performance of each store manager and ASM is annually evaluated, and these evaluations affect raises and/or bonuses. The bonuses available to store managers exceed those available to ASMs and clerks by up to 200%. Plaintiff, however, never earned a team-share bonus and contends that in-store bonuses were contingent upon unobtainable goals. While the parties dispute the actual authority of the store manager, they agree that each store manager is subject to the supervision of a district manager. The district manager supervises between fifteen to twenty-five stores but does not normally have keys to those stores.

On December 6, 2003, Ely was hired by Defendant and, following two weeks of training, began work as the store manager of Dolgencorp's Store No. 8167 in Conroe, Arkansas. Approximately one month later, Ely was transferred to Store No. 3737 because, as he characterized it, the store was a problem store and needed a strong manager. On March 16, 2005, while still the store manager of Store No. 3737, Ely's employment was terminated. Ely's starting salary was $673.08 weekly, which increased once in April of 2004 to $679.80. The ASM, the second highest paid employee, made only $8.25 per hour and, therefore, would receive $330 for a 40–hour work week. Ely admits knowing that he was a salaried employee, that he would not receive overtime pay, and that he received more compensation because he had more responsibility as the store manager. Plaintiff notes, however, that he worked 65–hour weeks, making his salary the effective equivalent of $2.21 more per hour than that which was earned by an ASM.

Dolgencorp operates on a "lean store-staffing model," Pl. Ex. 1, App. 7, ECF No. 51–2, under which store managers are provided labor budgets by district managers, which specify the number of hours that a store manager can schedule subordinate employees. This model reduces Defendant's primary expense—labor. As raised by Plaintiff, a common concern amongst store managers is how this staffing model leaves stores short staffed. The store managers voiced these concerns; however, instead of increasing labor hours, Defendant increased store hours of operation. Accordingly, despite being told that he would need to work only 48 hours a week, Ely was forced under this staffing model to work approximately 65 hours a week, frequently manning the store from open to close. During those hours, he often times ran the store with the aid of only one other employee, whose primary job was to run the cash register or stock shelves.

---

nonmoving party and affords the nonmovant all reasonable inferences, *see, e.g., Lexicon v. ACE Am. Ins. Co.*, 634 F.3d 423, 425 (8th Cir.2011) (citing *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 984 (8th Cir.2009); Fed. R.Civ.P. 56(a)), unless asserted facts are "blatantly contradicted by the record, so that no reasonable jury could believe [them]," *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). For purposes of summary judgment analysis, Defendant does not dispute Plaintiff's testimony of his activities during his work time.

2. The parties discuss two types of bonuses: team-share and in-store. It appears from Plaintiff's deposition that a team-share bonus is earned based upon the review of a store manager's performance. An in-store bonus is granted if you met certain in-store goals.

The labor shortage was most acutely felt by store managers on delivery truck days, when Ely, like many managers, was required to schedule all of his employees and exhaust 75% of his weekly labor hours. Ely notes that, in addition to the time lost to unloading the delivery truck, the most time-consuming tasks assigned to him, along with his fellow employees, was checking out customers and stocking shelves. Of his 65–hour work weeks, approximately 80% of Ely's time was dedicated to nonmanagerial, manual labor duties such as unloading trucks, stocking shelves, cleaning the store, and running the cash register. These extra hours were required of Ely, since he was not allowed to schedule overtime hours for the subordinate employees, and exceeding his allotted labor hours resulted in disciplinary action against him by the district manager.

The parties dispute whether part of Ely's job was to serve as the on-site human resource (HR) representative. Arguing in the affirmative, Defendant points to Ely's responsibility to collect new hire paperwork and communicate Dollar General's employment policies as evidence of Ely's role as HR representative. Defendant also points to Ely's deposition testimony that he served as the HR representative. Ely disputes this by arguing that, while he could make recommendations, he lacked the authority to give a pay raise or promotion, or to even fill out the paperwork when the district manager granted them. Defendant notes that Ely saw his managerial responsibilities of hir-

ing, scheduling, and training as necessary for the success of his store. Dollar General points to Ely's duty to assess the work performance of the ASMs and clerks, discipline them for poor performance, and coach them on means to improve as evidence of his managerial position. He was also responsible to receive and implement store reports, recalls, and product promotions as well as monitor store trends in sales and shrink. Furthermore, Defendant distinguishes Ely's position by acknowledging that he was the only employee in the store who could conduct interviews, create employee schedules, handle customer complaints, and void or refund transactions.

While not disputing this, Ely distinguishes himself from the district manager, whom he contends was the actual head of the store, demonstrated by the fact that the district manager had to approve all price mark downs, had to be notified of all write ups, and determined the labor hours available for scheduling. Ely concedes that he performed some of the duties listed by Defendant as "Duties and Essential Job Functions" for store managers on its store manager job description sheet, Def.'s Ex. 12, ECF No. 43–17, such as recruiting and staffing the store, training the employees, evaluating employee performance, holding safety meetings, completing paperwork, and ensuring the financial integrity of the store. Ely counters, however, that he did not perform all the tasks on the list since he never fired an employee, and he could not fire[3] or hire[4] any employee without

---

**3.** Defendant contends that Plaintiff fired three employees after arriving at his second store without the approval of his district manager. However, the deposition reflects the opposite: "Q. Okay. And it's your testimony that you didn't fire anybody? A. I never fired anybody." Def.'s Ex. 2, Ely's Dep. 274:13–14, ECF No. 43–2. "Q. So every time you fired somebody, afterwards you would let Joe know, right? A. No. He would know it's

coming before. Joe, this happened again, this person's gone. I agree." *Id.* at 118:6–9.

**4.** There is some inconsistency in the record regarding Ely's ability to hire without approval. In his deposition, Ely stated, "Q: Did you have to get [district manager] Joe's approval before you hired somebody? A. No." Def.'s Ex. 2, Ely's Dep. 130:9–11, ECF No. 43–2. Later, Ely qualified this, saying district man-

first obtaining the consent of the district manager. Ely was unable to independently set pay rates, determine if someone could be rehired, grant raises or promotions, or mark down items for sale. Plaintiff had no control over the store's thermostat, hours of operation, or contracts with outside vendors. While admitting that he had minimal discretion in merchandise purchase and product placement, Ely notes that over 90% of product placement was predetermined by corporate planograms, and his discretionary placement was subject to the district manager's approval. Ely lacked the authority to fix maintenance problems in the store or transfer merchandise in or out of the store. Furthermore, Plaintiff notes that he performed duties not contained on the list, including cleaning, stocking, and taking out the trash, and shared some of his tasks since the ASM was qualified to train new hires, make bank deposits, and write up employees. While Ely admits that he was one of the greatest influences on the profitability of his store, he also attributes the store's success to Defendant. Ely does not deny that he performed managerial duties but rather proffers that his primary and most profitable duties were nonmanagerial. While Defendant insists that Ely could have delegated these nonmanagerial tasks, Ely counters that low budgeting and staffing required that he perform them personally.

Ely admits that it was his responsibility to meet with vendors when they made deliveries to the store. His control of store finances, however, was minimal, as the district manager controlled the most sizable expense—labor. While Ely does not dispute Defendant's claim that district manager Joe Vecchio made only periodic visits to Ely's store every four to six weeks, Ely still characterizes the district manager as providing continuous supervision whether in person, by phone, or through the need for his approval for day-to-day operations. In support, Ely notes that he was required to check the store's voicemail twice a day. Furthermore, Ely argues that the district manager's in-person visits were exhaustive, as the district manager would provide Ely approximately fifty notes for the store, including critiques and required changes.

Ely points to Dollar General's internal survey to demonstrate that Defendant places a lesser value on the store manager's managerial tasks, as Dollar General felt it could reduce the store manager's managerial work by eliminating unnecessary reporting requirements and bank drops. Dollar General's general description of a store manager's duties contemplates considerable physical exertion, which Ely argues supports the conclusion that the primary purpose of his position was nonmanagerial. Additionally, on multiple occasions, the district manager sent Ely to other stores in order to perform purely manual labor duties. Ely admits that he made requests of and suggestions to the company, both in regard to the functioning of his store and the promotions and raises to which he considered his subordinate employees entitled, some of which were granted and others which were not.[5]

## II. DISCUSSION

### A. Motion to Strike

Before considering Defendant's Motion for Summary Judgment, the Court will address Dolgencorp's Motion to Strike. Defendant contends that Exhibits 2–8 and

ager Joe Vecchio "had to give [him] the okay" before he could hire someone. Pl.'s Ex. 31, Ely Dep. 300:2–301:24, ECF No. 51–1.

5. The record reflects that the district manager refused a hiring recommendation and promotion recommendation made by Ely.

10–14 provided by Ely fall short of the evidentiary threshold for admissibility. Dolgencorp challenges the admissibility of the 2004 Dollar General Survey it produced internally. These surveys were conducted in a select number of Dollar General's stores in Texas and Oklahoma. Defendant contends that these exhibits lack a proper foundation, as required by Federal Rule of Evidence 602. Dollar General further alleges that Plaintiff misinterprets these surveys, which contemplate the time allocation of an entire store, not just its store manager. Furthermore, Defendant objects on the basis of hearsay, as the surveys were reliant upon statements made by employees that are being used for the truth of the matter asserted. Finally, Defendant asserts that the proffered evidence is improper and confusing.

Plaintiff counters that the internal survey illuminates Defendant's business model and its repercussions on his job. Ely cites to this internal survey to support his factual assertion that an average employee walks three to eight miles and carries three to four tons of merchandise while unloading a delivery truck. Relying on a sample like that which is provided in this survey, Ely contends, is standard, and Dollar General provides no evidence that this sample would not be representative of Ely's store. Ely argues that the exhibits are relevant because they directly speak to his contention that Dollar General's actions were willful violations of the law. Plaintiff concludes that Defendant can argue why the Court should not be persuaded by the internal survey, but it cannot keep the Court from considering it.

Defendant requests that the Court strike from the record Plaintiff's use of Dollar General's Story Newsletters, contending that they are irrelevant as anecdotal summaries, some of which predate Ely's employment. Plaintiff's respond that the newsletters are kept in the regular course of Dollar General's business. Furthermore, the newsletters discuss relevant facts that Dollar General downplays, such as the prominent role that the SOPs and district managers play in the management of Defendant's stores.

Defendant also argues that Exhibit 18, the January 2001 evaluation of store manager Kimberly Baker, lacks foundation, is hearsay, is irrelevant, and causes confusion and unfair prejudice. Plaintiff counters that the form was used merely to demonstrate that the same factors were used to evaluate an ASM as were used for a store manager, as is established by the header of the document. Furthermore, contrary to Defendant's contention, Ely asserts that the statements of Ms. Brown are irrelevant for the purposes of his use of the document.

Finally, Defendant objects to Exhibit 28, a page from the 2005 SOP Manual. Because this page did not exist during the time of Ely's employment, Defendant argues that it is irrelevant and should be stricken. Ely counters that the use of the SOP was to illustrate how Defendant micro-manages its stores through the SOPs, and that he merely selected one such illustration from this manual.

■ "[R]ulings on motions to strike are committed to [a] district court's sound discretion." *Moore v. City of Desloge, Mo.*, 647 F.3d 841, 849 (8th Cir.2011). "Despite this broad discretion however, striking a party's pleadings is an extreme measure, and, as a result, [the Eighth Circuit Court of Appeals] ha[s] previously held that '[m]otions to strike under [Rule] 12(f) are viewed with disfavor and are infrequently granted.'" *Stanbury Law Firm v. I.R.S.*, 221 F.3d 1059, 1063 (8th Cir.2000) (third alteration in original) (quoting *Lunsford v. United States*, 570 F.2d 221, 229 (8th Cir. 1977)).

Federal Rule of Civil Procedure 12(f) provides that a "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). As this Court has previously held, the language of this rule limits it application to pleadings. *See Wilson v. City of Des Moines*, 338 F.Supp.2d 1008, 1023 n. 19 (S.D.Iowa 2004). Pleadings include complaints, answers to complaints, answers to counterclaims, answers to crossclaims, third-party complaints, answer to third-party complaints, and court-ordered replies to an answer. Fed.R.Civ.P. 7(a). Before the Court is Defendant's Motion to Strike exhibits attached to Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment. As Rule 12(f) does not extend to motions, Defendant's motion is inappropriate and, therefore, denied. *See Wilson*, 338 F.Supp.2d at 1023 n. 19; *see also Jones v. Dolgencorp, Inc.*, 789 F.Supp.2d 1090, 1095–1100 (N.D.Iowa 2011) (denying, under similar factual circumstances, Defendant's Motion to Strike).

On consideration of its Motion for Summary Judgment, Defendant certainly can assert that Ely "cannot produce admissible evidence to support [a] fact." Fed.R.Civ.P. 56(c)(1)(B). But the evidence need not be in admissible form at the motion stage. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Thus, the arguments put forward in the motion to strike play a role in the Court's consideration of the record evidence, impacted herein by the general lack of factual dispute, but the Court does not strike the proffered evidence rendering its weight zero at this time.

### B. Summary Judgment Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party must support its contention by pointing to "the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" to demonstrate that no genuine issue of material fact exists. Rule 56(c)(1)(a). The evidence must be "viewed in the light most favorable to the non-moving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (citing Fed. R.Civ.P. 56(c)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

The initial burden falls on the movant to "inform[ ] the district court of the basis for its motion and identify[ ] those portions of the record which show a lack of genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir.1992). However, it is the nonmovant's burden to "produce sufficient evidence to support a verdict in his favor based on more than speculation, conjecture, or fantasy." *Doe v. Dep't of Veterans Affairs of the U.S.*, 519 F.3d 456, 460 (8th Cir.2008) (internal quotation omitted). "A party cannot defeat a summary judgment motion by asserting 'the mere existence of *some* alleged factual dispute between the parties'; the party must assert that there is a '*genuine* issue of *material* fact.'" *Quinn v. St. Louis County*, 653 F.3d 745, 751 (8th Cir.2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The fact must be material so that it "might affect the outcome of the suit under the governing law." *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505. The grant of sum-

mary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *In re Baycol Prods. Litig.*, 596 F.3d 884, 888–89 (8th Cir.2010) (quoting *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548). "In sum, the evidence must be 'such that a reasonable jury could return a verdict for the nonmoving party.'" *Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 791 (8th Cir.2009) (quoting *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505).

### C. FLSA

■ "The FLSA generally requires that all employers compensate their employees at the rate of one and one-half times their normal hourly rate for all hours worked in excess of a 40–hour week." *Specht v. City of Sioux Falls*, 639 F.3d 814, 819 (8th Cir.2011) (quoting *Benshoff v. City of Va. Beach*, 180 F.3d 136, 140 (4th Cir.1999) (citing 29 U.S.C. § 207(a)(1))). An exception to this general rule provides that employers can exempt workers "employed in a bona fide executive, administrative, or professional capacity." *Guerrero v. J.W. Hutton, Inc.*, 458 F.3d 830, 834 (8th Cir. 2006) (quoting 29 U.S.C. § 213(a)(1)). The burden to prove that such an exception applies rests with the employer. *See Hertz v. Woodbury Cnty., Iowa*, 566 F.3d 775, 783 (8th Cir.2009). Employees must be shown to "fit plainly and unmistakably within the exemption's terms and spirit." *Spinden v. GS Roofing Prods. Co., Inc.*, 94 F.3d 421, 426 (8th Cir.1996) (quoting *McDonnell v. City of Omaha, Neb.*, 999 F.2d 293, 296 (8th Cir.1993) (internal quotations omitted)).

■ "[W]hether an employee is exempt under the FLSA is an issue of law." *Jarrett v. ERC Props., Inc.*, 211 F.3d 1078, 1081 (8th Cir.2000) (citing *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714, 106

S.Ct. 1527, 89 L.Ed.2d 739 (1986)). The Eighth Circuit has held that "[c]ourts should broadly interpret and apply the FLSA to effectuate its goals because it is remedial and humanitarian in purpose." *Specht*, 639 F.3d at 819 (internal quotation omitted); *see also Pignataro v. Port Auth. of N.Y. and N.J.*, 593 F.3d 265, 268 (3d Cir.2010) ("Exemptions from the FLSA are to be narrowly construed against the employer, and the employer has the burden of establishing an exemption."). To promote this goal, the Department of Labor (DOL) has provided regulations that contain factors that guide the Court in determining whether an employee qualifies for an exemption. *See Fife v. Bosley*, 100 F.3d 87, 89 (8th Cir.1996) (citing 29 C.F.R. pt. 541). These regulations were amended by the DOL on August 23, 2004. Prior to these amendments, the regulations provided both a "short test" and a "long test" to be used in determining an employee's status. *See* 29 C.F.R. § 541.1 (2003). The "long test" requires the employer to show that the employee is one

> (a) Whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof; and
>
> (b) Who customarily and regularly directs the work of two or more other employees therein; and
>
> (c) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and
>
> (d) Who customarily and regularly exercises discretionary powers; and
>
> (e) Who does not devote more than 20%, or, in the case of an employee of a retail or service establishment who does not

devote as much as 40%, of his hours of work in the workweek to activities which are not directly and closely related to the performance of the work described in paragraphs (a) through (d) of this section: Provided, that this paragraph shall not apply in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment, or who owns at least a 20–percent interest in the enterprise in which he is employed; and

(f) Who is compensated for his services on a salary basis at a rate of not less than $155 per week. . . .

*Id.* This test is limited in subsection (f) where it provides for the "short test" if the employee "is compensated on a salary basis at a rate of not less than $250 per week." *Id.* § 541.1(f). In such a circumstance, as here, an employee need only satisfy subsections (a) and (b) of 29 C.F.R. § 541.1 (2003). Both parties agree that, for the purposes of the pre–2004 test, Ely's salary started and remained within the statutory qualifications for the "short test." Furthermore, neither party contests that Ely "customarily and regularly direct[ed] the work of two or more other employees." *Id.* § 541.1(b). Therefore, the only factor at issue is whether Ely's "primary duty" was "management."

"A determination of whether an employee has [management] as his primary duty must be based on all the facts in a particular case." *Spinden,* 94 F.3d at 427 (quoting 29 C.F.R. § 541.103 (2003)). Drawing from the primary duty factors given by the DOL, the Eighth Circuit Court of Appeals has held that, in addition to considering the amount of time spent on managerial duties, a court must consider

the relative importance of the managerial duties as compared with other types of duties, the frequency with which the employee exercises discretionary powers, his relative freedom from supervision, and the relationship between his salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor.

*Murray v. Stuckey's Inc.,* 939 F.2d 614, 618 (8th Cir.1991) (quoting 29 C.F.R. § 541.103 (2003)) (*Murray I* ).

In 2004, the DOL amended the regulations and provided a new test for the term "executive employee," stating that it meant an employee

(1) Compensated on a salary basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;

(2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3) Who customarily and regularly directs the work of two or more other employees; and

(4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a)(1)-(4)(2004). Ely's employment began in December 2003 and ended in March 2005. Therefore, the pre–2004 test will apply to the first months of Ely's employment, and the remaining months are subject to the amended standard. *See Baden–Winterwood v. Life Time Fitness, Inc.,* 566 F.3d 618, 629 (6th Cir.2009) (holding that the "DOL regulations do not apply retroactively"); *See Kanatzer v. Dolgencorp, Inc.,* No. 4:09cv74 CDP, 2010 WL 2720788, at *3 n. 2 (E.D.Mo. July 8, 2010) ("Where, as here, the claim period spans the change in regulation, it is appropriate to apply the amended regulations to the actions occur-

ring after the amendment took effect, while applying the un-amended regulation to the actions occurring before the amendment.").

Just as with the pre–2004 standard, the parties do not dispute that Ely's weekly compensation satisfied the requisite $455 minimum. Similarly, Ely consistently supervised more than one ASM and clerk. This leaves at issue only his "primary duty" and ability to "hire or fire." Therefore, despite the two separate standards, only one analysis is necessary to determine Ely's classification under the regulations. *See Roberts v. Dolgencorp, Inc.,* No. 2:09–0005, 2010 WL 4806792, at *6 (M.D.Tenn. Nov. 18, 2010) (holding that "[d]espite the two sets of regulations, the determinative issue here is whether [plaintiff's] 'primary duty' was management of the enterprise, that is, her Dollar General store").

### 1. Amount of Time Spent on Managerial Activities

How employees divide their time between exempt and nonexempt work is a question of fact. *See Reich v. Avoca Motel Corp.,* 82 F.3d 238, 240 (8th Cir.1996). Ely asserts that he spent 20% of his time performing managerial tasks while the remaining 80% of his time went to manual labor duties. In support of this, Ely provides an account of the various nonmanagerial duties that he alleges monopolized his time: unloading delivery trucks, stocking shelves, cleaning the backroom, running the cash register, cleaning restrooms, windows, and shelves, sweeping and mopping the floor, cleaning the parking lot, and recovering the store. Dollar General indirectly counters Ely's assertion by arguing that Ely could not possibly perform the number of managerial functions he admits he completes in the 20% of time he contends he spends on them. However, Defendant does not directly proffer its own percentages but, instead, insists that Ely was "concurrently" performing managerial and manual labor duties. As noted at note 1, *supra,* however, for purposes of summary judgment analysis, Defendant does not dispute Plaintiff's testimony of his activities during his work time.

Ely testified in his deposition that he spent a considerable amount of time outside of his store, not managing it at all. Four times a year, for four or five days at a time, he was sent by his district manager to prepare other stores for inventory. The district manager also sent him seven or eight times to other stores where he performed manual labor duties.[6]

"In the ordinary case it may be taken as a good rule of thumb that primary duty means the major part, or over 50 percent, of the employee's time." 29 C.F.R. § 541.103 (2003). *See* 29 C.F.R. 541.700(b) (2004) ("The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee. Thus, employees who spend more than 50% of their time performing exempt work will generally satisfy the primary duty requirement."). This general rule, however, is not

---

6. Ely also exhaustively argues that he cannot qualify as an exempt employee because the exemptions were intended for white collar employees while he is a blue collar employee. The regulations provide that the exemptions "do not apply to manual laborers or other 'blue collar' workers .... [who] gain the skills and knowledge required for performance of their routine manual and physical work through apprenticeships and on-the-job training, not through the prolonged course of specialized intellectual instruction required for exempt learned professional employees." 29 C.F.R. § 541.3(a). Ely argues that his two week training cannot qualify as a "prolonged course of specialized intellectual instruction," and, therefore, his employment constitutes little more than routine manual and physical work. Because Defendant has failed to meet its burden on the affirmative defense, the Court need not consider this argument at this time.

dispositive. *See Murray I*, 939 F.2d at 614 (holding store managers exempt despite spending 65–90% of their time performing nonmanagerial duties); *see* 29 C.F.R. § 541.700(b) (2004) ("Time alone, however, is not the sole test.... Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion."). Numerous cases have held that, despite exceeding the 50% guideline, other factors demonstrated that the employee's position was managerial in nature. *See, e.g., Spinden*, 94 F.3d at 427 ("As the regulations make clear, the percentage of time an employee spends on administrative tasks is but one factor in determining if administration is that employee's primary duty."); *see, e.g., Aschenbrenner v. Dolgencorp., Inc.*, No. 8:10CV00153, 2011 WL 2200630, at *11 (D.Neb. June 3, 2011) ("That [plaintiff] may have spent 85 per-

cent of her time performing non-managerial tasks and sometimes worked alone in the store is not determinative of the primary-duty issue, and the Court must consider the other relevant factors.").

In view of the record before this Court, Defendant has failed to present sufficient evidence to demonstrate that it is entitled to summary judgment on this factor. Since Defendant has offered no alternative division of time and labor, the Court cannot hold that this factor supports Defendant's contention. *See Jones*, 789 F.Supp.2d at 1103–04 (holding that defendant had failed to meet their burden when they disputed the plaintiff's estimated division of labor but failed to offer an alternative into evidence). Defendant attempts to avoid this burden by contending that Ely served simultaneously as a manual laborer and a manager because he thought about ways to improve the store while performing manual labor.[7] However, this state-

---

**7.** Notably, Defendant does not cite to any case that suggests that thought alone equals the performance of managerial duties. Instead, Dollar General supports its case by referencing a Fourth Circuit appellate case that held against the plaintiff by pointing to the FLSA and arguing that it recognizes that "the nature of retail business[ ] exempts retail executives from the requirement that the majority of their hours be spent on executive functions." *In re Family Dollar FLSA Litig.*, 637 F.3d 508, 515 (4th Cir.2011). In support, the case quotes 29 U.S.C. § 213(a)(1) as saying,

> an employee of a retail or service establishment shall not be excluded from the definition of employee employed in a bona fide executive or administrative capacity because of the number of hours in his workweek which he devotes to activities not directly or closely related to the performance of executive or administrative activities.

However, this is only a partial quotation. The full quote says,

> an employee of a retail or service establishment shall not be excluded from the definition of employee employed in a bona fide executive or administrative capacity because of the number of hours in his workweek which he devotes to activities not di-

rectly or closely related to the performance of executive or administrative activities, *if less than 40 per centum of his hours worked in the workweek are devoted to such activities.*

29 U.S.C. § 213(a)(1) (2004) (emphasis added). Such an omission changes the meaning of the sentence. The Fourth Circuit went on to conclude that even if the plaintiff was performing manual labor 99% of the time, that did not preclude her from being responsible for the running of the store 100% of the time. *In re Family Dollar FLSA Litig.*, 637 F.3d at 515. In making this determination, the court noted that the plaintiff controlled inventory, payroll, store supplies, and managed loss, safety, and accidents. *Id.* at 516. This was a fact-intensive consideration that is not sufficiently analogous to the facts in present case. The regulations do provide that:

> [c]oncurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the requirements of § 541.100 are otherwise met. Whether an employee meets the requirements of § 541.100 when the employee performs concurrent duties is determined on a case-by-case basis and based on the factors set forth in § 541.700. General-

ment is conclusory, as Dollar General fails to provide any factual basis for its contention. *See Thomas v. Speedway SuperAmerica, LLC,* 506 F.3d 496, 504 (6th Cir. 2007) ("A determination of whether an employee has management as [his] primary duty must be based on all the facts in a particular case." (quoting 29 C.F.R. § 541.103 (2003))). The Eighth Circuit has held that a "person 'in charge' of a store has management as his primary duty, even though he spends the majority of his time on non-exempt work and makes few significant decisions." *Murray I,* 939 F.2d at 617 (quoting *Donovan v. Burger King Corp.,* 672 F.2d 221, 227 (1st Cir. 1982)); *but cf. Marshall v. Truman Arnold Distrib. Co., Inc.,* 640 F.2d 906, 910 (8th Cir.1981) (finding that, while the district court did not err in its holding, the factual determination was "a close one" when the plaintiff "hired, supervised, trained, kept time on, and paid employees to work for him at the station he leased," while "perform[ing] other managerial

ly, exempt executives make the decision regarding when to perform nonexempt duties and remain responsible for the success or failure of business operations under their management while performing the nonexempt work. In contrast, the nonexempt employee generally is directed by a supervisor to perform the exempt work or performs the exempt work for defined time periods. An employee whose primary duty is ordinary production work or routine, recurrent or repetitive tasks cannot qualify for exemption as an executive. 29 C.F.R. § 541.106(a). However the DOL expresses that "[i]t continues to be the Department's position that substantial nonexempt work cannot routinely be assigned to exempt employees without calling into question the application of the exemption to that employee." Department of Labor Opinion Letter, Op. Letter, Wage & Hour Division U.S. Dep't of Labor, 2006 DOLWH LEXIS 40, at *9 (Sept. 8, 2006).

Applying the requisite case-by-case approach, the Eleventh Circuit Court of Appeals found in *Morgan v. Family Dollar Stores, Inc.,*

duties, including bookkeeping, and order[ing] various sundry items"). However, this Court finds the reasoning in Jones persuasive that "being 'in charge' may be in title only." *Jones,* 789 F.Supp.2d at 1104 (citing *Kanatzer,* 2010 WL 2720788, at *2 ("An employee is not automatically an exempt executive merely because she is labeled a 'manager' or because she is 'in charge' of a particular store."); *see Ale v. Tenn. Valley Auth.,* 269 F.3d 680, 691 (6th Cir.2001) ("The words 'in charge' are not a magical incantation that render an employee a *bona fide* executive regardless of his actual duties.")). The regulations themselves support this conclusion by stating "[a] job title alone is insufficient to establish the exempt status of an employee. The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations in this part." 29 C.F.R. § 541.2 (2004).

551 F.3d 1233, 1269–70 (11th Cir.2008), that store managers who spent 80 to 90% of their time doing manual labor duties did not qualify as executive employees. The court reasoned that "a store manager unloading a truck and stocking the storeroom [i]s not concurrently supervising the cashier out front." *Id.* at 1273. This reasoning is enlightening to the present case, where Ely contends that he spends the majority of his time unloading a truck and stocking shelves. Notably, other cases have held that management and nonmanagement functions may not be easily severable. *See Thomas v. Speedway SuperAmerica, LLC,* 506 F.3d 496, 504 (6th Cir.2007). However, in *Speedway,* the plaintiff testified that her nonmanagerial duties often overlapped with her managerial duties. *Id.* The court then "refuse[d] to give undue weight to the time factor of the 'primary duty' inquiry." *Id.* Here, Ely has made no such concession. Ultimately, Defendant has simply failed to meet his burden in demonstrating that Ely was concurrently performing managerial tasks while completing his manual labor duties.

While Defendant contends that Ely concedes being in charge of the store on a daily basis, the record demonstrates that Ely contrarily believes that the district manager and corporate directives micromanaged his store. While he admits to being "in charge" and "the leader," he also notes that he was unable, among other things, to cure maintenance problems, adjust the thermostat, contract with outside vendors, choose the store's hours of operations, set the labor budget, or fire, hire, or promote an employee without the approval of the district manager or corporate office. Ely may have been labeled "in charge"; however, facts, not labels, actually dictate whether his time was spent on managerial duties.

In *Spinden v. GS Roofing Products Co., Inc.*, 94 F.3d 421, 427 (8th Cir.1996), a case to which Defendant cites for support, the Eighth Circuit Court of Appeals held that "the percentage of time an employee spends on administrative tasks is but one factor in determining if administration is that employee's primary duty." After reviewing the record as a whole, the court found that despite spending 80 to 90% of his time on "routine and nondiscretionary" tasks, the plaintiff qualified as an executive employee. *Id.* In making this determination the court noted that Spinden participated in weekly meetings with the senior management, was registered as the compa-

ny's agent for service of process, and signed contracts and tax documents on behalf of the company. *Id.* at 428. Furthermore, Spinden created reports for the company, which acted as a score card for the plant, enabling the company to obtain crucial pricing and production information. *Id.* Notably, the court did not find that an employee spending 10 to 20% of time on managerial tasks satisfied the factor; instead, the court found that factor was not controlling. *Id.* at 427. While the imbalanced division of time did not preclude the court from finding Spinden exempt, it was only after review of all the factors provided by the regulations that they came to such a conclusion. Here, where the factors clearly demonstrate that Plaintiff was not in an analogous position of management, the Court must find this factor in favor of Ely. Therefore, since the Defendant has failed to meet its burden, this factor weighs in favor of a finding for Plaintiff, and the Court will consider if the remaining factors can support Defendant's affirmative defense.[8] *See Plaunt v. Dolgencorp, Inc.*, Nos. 3:09cv079, 1:09cv084, 2010 WL 5158620, at *7 (M.D.Pa. Dec. 14, 2010) (holding that where defendant had not disputed that plaintiff spent the majority of her time performing nonmanagerial tasks, the court presumed the factor favored her and proceeded to consider the remaining factors); *See Myrick v. Dolgen-*

---

**8.** These cases present close calls and individual situations, and not surprisingly courts have concluded contrarily. *See Mayne–Harrison v. Dolgencorp, Inc.*, Civil Action No. 1:09–CV–42, 2010 WL 3717604, at *20 (N.D.W.Va. Sept. 17, 2010) ("[E]ven assuming that [plaintiff] spent the bulk of her time performing non-managerial tasks such as stocking the shelves, unloading the shipment truck, cleaning the store, and manning the cash register, the record reflects that [plaintiff] could simultaneously perform many of her management tasks .... [such as] the supervis[ing] of employees, handl[ing] customer complaints, deal[ing] with vendors, and complet[ing] daily

paperwork."); *See Roberts v. Dolgencorp, Inc.*, No. 2:09–0005, 2010 WL 4806792, at *8 (M.D.Tenn. Nov. 18, 2010) (holding in favor of the defendant, after plaintiff admitted she spent "25 hours per week on management activities," because the court concluded that even during "non-managerial tasks, she was, by necessity, also supervising her employees and ensuring that they were following protocol"); *In re Dollar General Stores FLSA Litig.*, 766 F.Supp.2d 631, 640 (E.D.N.C.2011) (finding that, while the plaintiffs spent a majority of their time doing nonmanagerial work, they were also simultaneously performing managerial duties).

*corp, LLC,* Civil Action No. 7:09–CV–5 (HL), 2010 WL 146874 (M.D.Ga. Jan. 11, 2010) (finding that since plaintiff's 20% managerial and 80% manual labor apportionment did not meet the 50% threshold, the other factors needed to be considered).

### 2. Relative Importance of Managerial Duties as Compared to Nonmanagerial Duties

■ The second factor before the Court is the relative importance of Ely's managerial duties in contrast to his nonmanagerial duties. Importance is determined from the viewpoint of the employer. *See Dalheim v. KDFW–TV,* 918 F.2d 1220, 1227 (5th Cir.1990) ("At least under the short tests, the employee's primary duty will usually be what she does that is of principal value to the employer, not the collateral tasks that she may also perform, even if they consume more than half her time."). Courts have routinely addressed this factor by considering how the store would function were the employee not to perform his or her managerial or nonmanagerial duties respectively. *See Pierce v. Dolgencorp, Inc.,* Nos. 3:09–cv–079, 4:09–cv–097, 2011 WL 398366, at *8 (M.D.Pa. Feb. 03, 2011) ("One logical way of addressing [the relative importance of an employee's duties] is to imagine how the store would function if the employee did not perform her non-managerial or managerial duties, alternatively."); *see Aschenbrenner,* 2011 WL 2200630, at *11 ("[T]he Court must consider whether [plaintiff's] store could have operated as successfully without the managerial tasks carried out by [plaintiff]."); *See Speedway,* 506 F.3d at 505–06 (holding that an employee's exempt managerial tasks were more important when the store would cease operating, were the employee to fail to perform those acts). While considering these duties, the Court must keep in mind a company's foremost goal of achieving overall success. *See Leonard v. Dolgencorp Inc.,* Civil Action No. 4:10–CV–57–H, 2011 WL 2009937, at

*6 (W.D.Ky. May 23, 2011) (citing *Donovan v. Burger King Corp.,* 675 F.2d 516, 521 (2d Cir.1982)).

The regulations provide that management duties include the following:

interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102. In addition to the work performed, the Court should also consider Ely's "job description, performance review criteria, bonus plan, and training." *Aschenbrenner,* 2011 WL 2200630, at *11.

As a preliminary note, many courts have held that this intensive fact-based inquiry is inappropriate for summary judgment. *See Rubery v. Buth–Na–Bodhaige, Inc.,* 470 F.Supp.2d 273, 277 (W.D.N.Y.2007) (denying summary judgment); *See Indergit v. Rite Aid Corp.,* Nos. 08 Civ. 9361(PGG), 08 Civ. 11364(PGG), 2010 WL 1327242, at *8 (S.D.N.Y. Mar. 31, 2010) (denying summary judgment due to, in part, "the incomplete nature of the record,

and the parties' factual disputes concerning Plaintiff's primary job responsibilities, mak[ing] it improper for th[e] Court—at this time—to resolve Plaintiff's claim as a matter of law"). In the absence of a material dispute of fact in this record, it becomes an issue of factual support for the Defendant's asserted legal conclusion. While it is the Court's role to determine Ely's status, the present record is insufficient to satisfy Defendant's burden in showing that Ely's managerial roles were more important than his nonmanagerial duties.

■ Undoubtedly, Ely's managerial role was central in the efficient running of his store. Satisfying many of the criteria enumerated in the regulations, Ely recruited employees, directed and supervised their work, evaluated their performance, made recommendations regarding their pay rate and advancement, ensured their safety, identified business trends, monitored in-stock targets, ensured compliance with business procedures, and completed paperwork. However, nearly all of Ely's roles were subordinate to or preempted by the pervasive governance of the district manager and corporate headquarters. While Ely conducted interviews and gave recommendations, the district manager controlled the ability to hire, to fire, to promote, to set salaries, and to grant raises. The weekly employee schedule was set by Ely, but the labor hours were entirely controlled by the district manager, the restrictive issuing of which largely controlled Ely's scheduling. Ely evaluated employee performances, but all firing and promotions were completed at the district manager's discretion. The district manager and corporate headquarters additionally controlled the markdown of items for sale, the placement of over 90% of the items in the store, the selection of inventory, and the store's hours of operation. Ely's ability to direct and supervise the work of other staff was constrained by staff limitations and practical workload, as more fully discussed *infra* at pages 889–90.

Furthermore, Ely's nonmanagerial duties were essential. While some courts have found that branch stores could not run without managers, *see, e.g., Speedway,* 506 F.3d at 505, this record indicates that the store could not have run without the hours of manual labor demanded of Plaintiff. *See Pierce,* 2011 WL 398366, at *9 ("[A] reasonable jury could, just as plausibly, conclude that [defendant] valued [plaintiff's] non-managerial contributions more highly than her managerial functions because [defendant] repeatedly refused to grant her more employee hours for her budget."). To conclude that the store could not run without Ely as a manager appears grandiose, since Ely shared some managerial tasks with the ASM and most of the day-to-day tasks were dictated by corporate in writing. Defendant quotes Ely's admission that failure for him to perform his managerial duties would result in the store "suffering" while failure for him to perform his nonmanagerial duties would result in the store being "messy." The record clearly reflects, however, that removing this "mess" is exactly what Plaintiff viewed as a primary means of making a store more successful. Undoubtedly, the efficient manner in which Ely ran his store contributed to its profitability. Nonetheless, if Ely's approximate 80% of 65 hours (52 hours) of manual labor per week were removed, the effect on the store could be equally devastating. *See Morgan,* 551 F.3d at 1270 (affirming the district court where "ample evidence supported a finding that the nonmanagerial tasks not only consumed 90% of a store manager's time but were of equal or greater importance to a store's functioning and success").

The acts and policies of Dolgencorp signal a high value for Ely's manual labor duties. The job description itself requires

nonmanagement duties. Specifically the store manager's job description stipulates that the position necessitates:

- Frequent walking and standing
- Frequent bending, stooping and kneeling to run check out station, stock merchandise and unload trucks
- Frequent handling of merchandise and equipment such as hand-held scanner, pricing guns, box cutters, merchandise containers, two-wheel dollies, and U-boats (six-wheel carts).
- Frequent and proper lifting of up to 40 pounds; occasional lifting of up to 55 pounds.
- Occasional climbing (using ladder)
- Regularly driving/providing own transportation to make bank deposits and occasionally to attend management meetings and to other Dollar General stores.

Pl.'s Ex. 15, ECF No. 51–16. The "lean store-staffing model" adopted by Dollar General demonstrates an emphasis on manual-labor duties. Rather than provide ample time for Ely to attend to his managerial duties of ensuring compliance with Dollar General rules and coaching employees, the lean labor hour model required Ely to dedicate the vast majority of his time to nonmanagerial tasks. In fact, the record reflects that not only were Ely's requests for additional labor hours ignored, the store's hours of operation were actually extended on the same minimal allocation of labor hours. Because Ely faced discipline for exceeding the labor hours allotted, the extension of hours of operation required even more hours of manual labor on Ely's part. Furthermore, Ely was sent to other stores to perform purely manual labor duties, a request that hardly supports Defendant's contention

that Ely's most beneficial role was managerial. *See Jones*, 789 F.Supp.2d at 1106 ("[N]ot[ing] that [plaintiff] was sent to other Dollar General stores to help out not for her managerial skills, but for her manual labor, which included stocking, recovering, and purging the backroom."). While Defendant contends that Ely was sent to other stores to implement the ideas from his store, the record does not clearly support this contention.

Similarly, while Defendant's store managers are evaluated based on some managerial roles, the same factors are considered in reviewing the performance of the ASMs, employees Defendant does not contend are exempt. Furthermore, the factors reviewed include nonmanagerial tasks, such as customer satisfaction.

Ely's compensation does not support a conclusion that his managerial role was of great importance to Defendant. As provided by Plaintiff, when broken down to correspond to the number of hours worked, Ely received only $2.21 more per hour than the ASM. While Defendant argues that incentive-based bonuses were made available to store managers, Ely contends that these bonuses were based upon unobtainable goals, making them little more than a fiction. This is supported by the fact that, despite Ely's long hours of labor, he was never awarded a bonus. Notably, Ely was provided with two weeks of training prior to his employment as a manager. This two-week investment, however, is insufficient to satisfy Defendant's high burden of proving that Ely "plainly and unmistakably" falls within the executive exception; therefore, this factor weighs in favor of Plaintiff.

### 3. Frequency With Which the Employee Exercises Discretionary Powers [9]

---

**9.** While Plaintiff address the following two factors concurrently, the Court will accord them separate consideration.

■ Defendant argues that Ely had discretionary powers since he delegated tasks to employees, made product placement decisions, made add-on orders for hot-selling products, improved the efficiency of his truck delivery process, and determined when necessary to hire, fire, and counsel employees. In Defendant's reply brief, Dollar General supports its contention by pointing to Ely's actions when he first became store manager of Store No. 3737. Defendant contends that he posted a "help wanted" sign, recruited three workers he knew from Wal–Mart, and fired three employees without prior approval. Ely counters, while denying that he ever fired an employee, that discretion ultimately fell to the district manager who had to approve each hire, fire, and promotion. This issue of hiring authority cannot be resolved on the current record and therefore leaves the Defendant's claim wanting.[10] Additionally, Plaintiff had no ability to set the starting rate of pay, mark down an item for sale, or grant an employee a raise. He had little discretion in the store layout and inventory, as even promotional displays were controlled by corporate, and the planogram controlled the location and number of items displayed, and he had no discretion in labor hours or the store's hours of operations. Notably, any discretion he did have, such as the layout of three to four endcaps, which constituted less than 10% of the endcaps in the store, was subject to the review of the district manager.

In *Thomas v. Speedway SuperAmerica, LLC,* 506 F.3d 496, 506 (6th Cir.2007), the Sixth Circuit Court of Appeals held that "[t]he plain language of this [employee discretion] factor instructs courts to focus merely on the prevalence or regularity of the plaintiff's discretionary decisions but [a court should] note that the employee's ex-

ercise of discretion over matters of importance strengthens the employer's showing under" this factor. The court went on to hold that because Thomas hired employees, delegated work, resolved employee complaints, set the weekly work schedule, granted vacation requests, evaluated employees' performance, discretionarily added additional inventory when on high demand, and resolved safety issues, she was accorded sufficient discretionary powers. *Id.* at 507. As addressed above, to determine whether an employee satisfies the exemption is a fact-specific inquiry. Contrary to the present case, Thomas did not complain of insufficient labor hours for her store. Where Thomas' delegation of work and weekly work scheduling might have been meaningful, Ely's was grossly restricted by insufficient labor hours, which necessitated that 75% of the hours allotted by the district manager be consumed on truck day. *See Jones,* 789 F.Supp.2d at 1107 (finding that the plaintiff "had no discretion over allocating the store's labor-budget, which significantly influenced her assigning work hours to her staff"). Furthermore, Ely often shared the store with only one other employee, requiring both of them to perform nonmanagerial duties. Though Ely did place a "help wanted" sign in the window without prior approval, Ely was not allowed to hire without approval from the district manager, and the record does not reflect whether Ely was empowered to grant vacation requests.

Defendant points to *Murray v. Stuckey's, Inc.,* 50 F.3d 564 (8th Cir.1995) (Murray II), in support of its argument. In this case, the Eighth Circuit held that employees had adequate discretionary power when they could hire employees, schedule work hours, train and discipline employ-

**10.** While Plaintiff may have been able to provide input on hirings, firings, and promotions, this ability is a separate consideration under both the pre–2004 and post–2004 test. *See* 29 C.F.R. § 541.1(c) (2003); *see also* 29 C.F.R. § 541.100(a)(4) (2004).

ees, order inventory, and handle customer complaints. *Id.* at 570. The court cited to *Marshall v. Sally Beauty Co., Inc.*, No. 80–4138, 1982 WL 2184, at *2 (E.D.La. April 19, 1982), which held that opening and closing the store, scheduling employee hours, ordering merchandise, handling customer relations, granting discounts and markdowns, extending credit and approving checks, resolving customer disputes, maintaining inventory, and determining display techniques constituted sufficient discretionary managerial tasks. Here, however, Ely noticeably lacks the power to hire, has restricted ability to schedule due to the limits labor hours provided, does not order inventory save an occasional add-on order for hot-selling products, cannot unilaterally grant discounts and markdowns, and does not control the great majority of the store display.

Furthermore, Plaintiff's ability to exercise discretion was notably limited by the pervasive governance of Dollar General's SOPs. The SOPs stipulated the procedures to be followed by an employee from how to handle an angry customer, to how to clean the floor, to what items to hang on a clipboard in the store's office. Defendant argues that in *Murray I*, the Eighth Circuit Court of Appeals decided as a matter of law that SOPs do not preclude a store manager from having management as his or her primary duty. *Murray I*, 939 F.2d at 619 ("Like other courts that have considered the question, we believe that the manager of a local store in a modern multi-store organization has management as his or her primary duty even though the discretion usually associated with management may be limited by the company's desire for standardization and uniformity."). However, since *Murray I*, the DOL has provided that

> The use of manuals, guidelines or other established procedures containing or relating to highly technical, scientific, legal, financial or other similarly complex

matters that can be understood or interpreted only by those with advanced or specialized knowledge or skills does not preclude exemption under section 13(a)(1) of the Act or the regulations in this part. Such manuals and procedures provide guidance in addressing difficult or novel circumstances and thus use of such reference material would not affect an employee's exempt status. The section 13(a)(1) exemptions are not available, however, for employees who simply apply well-established techniques or procedures described in manuals or other sources within closely prescribed limits to determine the correct response to an inquiry or set of circumstances.

29 C.F.R. § 541.704 (2004). The manual provided by Defendant does not address "highly technical, scientific, legal, financial or other similar complex matters" as contemplated by the DOL. Furthermore, other courts have persuasively distinguished the Eighth Circuit case, holding that Dollar General's manual provided more exhaustive governance than the "standardization and uniformity" contemplated in *Murray I*. *See Jones*, 789 F.Supp.2d at 1108 (holding *Murray I* "distinguishable from [plaintiff's] situation, because Dollar General's manuals not only dictated uniform store layout and hours of operation, but also provided detailed instruction for how store managers should handle numerous day-to-day situations, such as: confronting an angry customer; answering the telephone; running the cash register; what items should be hung on a clipboard in the store's office; handling weather emergencies; and, cleaning the store floor"); *see also Kanatzer*, 2010 WL 2720788, at *4 (holding the plaintiff's discretion "substantially limited by company policies and the oversight of her supervisors").

Defendant then argues that Ely cannot invoke the SOPs because Ely admitted

that he did not refer to the manual. This argument fails, however, as Defendant concedes that its stores were operated pursuant to its SOPs. Whether or not Ely referred to the manual, he was clearly required to follow it, as the Defendant admits. Even if the Court were to find that Ely had some discretionary power, the employee discretion factor was notably omitted in the 2004 update of the regulations. *See* 29 C.F.R. § 541.700(a) (2004) ("Determination of an employee's primary duty must be based on all the factors of a particular case.... Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee."). Accordingly, this Court finds Defendant has failed to meet its burden in demonstrating that Dollar General is entitled to summary judgment, and to the extent that the factor remains relevant, it weighs in favor of Plaintiff.

### 4. Relative Freedom from Supervision

Defendant argues that, unlike Ely's subordinate employees, Ely was nearly autonomous in the daily running of his store. The district manager visited Ely approximately once every four to six weeks, resulting in approximately nine to thirteen visits in Ely's 16 months of employment. On these visits, the district manager noted shortcomings of the store, instructed changes to be made, and reviewed Ely's discretionary decisions such as the arrangement of endcaps. Apart from these infrequent visits, Ely's primary communication with the district manager was by phone. Ely was required to monitor these communications, also received from corporate, at least twice a day. Ely's discretion

was therefore subject to some level of district manager ratification or reversal.

Ely contends, simultaneously with his argument about his lack of discretion, that corporate affected supervision through its planogram, which governed the placement of the store's items. Additionally, Ely argues that the manual micro-managed the store's daily running through the SOPs. Ely asserts that the district manager maintained supervision through the policies that required Ely to seek approval from the district manager before taking simple actions like marking an item down for sale or fixing a maintenance problem in the store.

While infrequent visits from a district manager would not defeat the requisite freedom from supervision, neither does supervision require a constant physical presence. However, from the record before us, it is apparent that Ely worked relatively free from supervision. *See Speedway,* 506 F.3d at 508 (holding that, when plaintiff's district manager supervised ten to twelve stores and did not provide "direct over-the-shoulder oversight on a day-to-day basis," plaintiff had sufficient relative freedom from supervision); *See Leonard,* 2011 WL 2009937, at *8 ("Assuming that the District Manager did monitor [plaintiff's] performance by calling daily and visiting even once a week, [plaintiff] remained free of direct supervision for most of her time on the job."); *See Pierce,* 2011 WL 398366, at *11 (holding that the factor favored exemption when "on most days [plaintiff] had no contact with any supervisor"). As Defendant contends, the district manager's visits were infrequent, and the phone calls were not store-specific. Therefore, this factor weighs in favor of Defendant's alleged exemption, and the Court must now consider the fifth factor. *See Anderson v. Dolgencorp of N.Y. Inc.,* Nos. 1:09–cv–3601 (GLS RFT), 1:09–cv–

363 (GLS RFT), 2011 WL 1770301, at *12 n. 7 (N.D.N.Y. May 9, 2011) (declining to discuss the third and fourth factors for even if they "were found to decidedly weigh in [defendant's] favor, [defendant's] failure to conclusively establish the fifth, in light of the court's findings [against summary judgment for factor one and two] above, weighs heavily against summary judgment").

### 5. Relationship in Wages

■ The final factor to be considered by this Court is how Ely's salary compares to the compensation provided to other employees. The regulations provide no guidance on how much more an exempt employee must earn than subordinate employees, nor do they provide a means by which to compare the two salaries. Defendant contends that since ASMs received only $8.25 per hour and worked, at most, a 40–hour week, their income potential capped at $330 weekly. Accordingly, Ely earned over 200% of what the next highest paid employee earned.

Ely asks this Court to take an objective approach in comparison and construe his salary into an hourly wage. *See Anderson,* 2011 WL 1770301, at *13 ("In the court's view, converting plaintiff's weekly salary into an approximate hourly wage is an appropriate way of finding a common basis with which to compare the wages paid to others."); *see Speedway,* 506 F.3d at 508 ("At the time of her termination, [plaintiff] earned $522 per week, and, assuming she worked an average of fifty hours per week, her weekly salary equaled $10.44 per hour."); *see Jackson v. Go–Tane Servs., Inc.,* 56 Fed.Appx. 267,

271 (7th Cir.2003) (finding plaintiff was not an executive employee when his salary broke down to $6.66 per hour, only $0.66 higher than a subordinate's pay rate); *see Plaunt,* 2010 WL 5158620, at *13 ("We find that converting Plaunt's weekly salary into an effective hourly wage is most appropriate in order to find a common basis with which to compare the wages paid to others.").

Breaking down Ely's $679.81 weekly salary, Ely was making approximately $10.46 per hour. The ASM was paid at an hourly rate of $8.25, resulting in an hourly difference of $2.21 or a pay increase of 27% over what an ASM made.[11] This Court finds persuasive that an employer can only place a premium on labor within the context of the amount of labor provided. Therefore, the above numbers are adopted for the purpose of determining the relationship between the employee's salary and the wages paid nonexempt employees.

Defendant references a case that found the plaintiff to be an exempt employee when he made 42% more per week than his team leader. *Kastor v. Sam's Wholesale Club,* 131 F.Supp.2d 862, 868–69 (N.D.Tex.2001). However, there is no indication that the court considered and compared what the plaintiff made on an hourly basis, as is under consideration here. Defendant then cites to *Speedway,* where the court held plaintiff exempt with a salary approximately 30% more than the hourly wage paid to subordinate employees. *Speedway,* 506 F.3d at 509. Despite the court's conclusion, the numbers in the case actually stand for an approximate

---

**11.** Plaintiff also requests that this Court consider the value of his weekly work hours in relation to the compensation owed to an hourly employee who is entitled to time and a half overtime pay. According to Plaintiff's calculations, this would result in an ASM receiving $330 for the regular 40–hour work week and an additional $309.38 for the 25

hours of overtime work. This would put an ASM's weekly pay at $639.38 if the ASM were to clock the 65 hours Ely works per week. With Ely salaried at $679.81, this secondary calculation results in a mere $40.43 difference per week, or an insignificant 6% higher salary.

50% difference between the employee's adjusted salary rate of $10.44 per hour and the subordinate employee's hourly rate of $7.00. *Id.* at 508–09. Regardless of the numerical discrepancy, this Court is not inclined to shrink the precedential percentage.[12]

Defendant then contends Plaintiff's eligibility for profit-based bonuses of up to $10,000, where ASMs could only earn up to 30% of said bonus, demonstrates a substantial pay difference. However, despite Ely's long hours and considerable effort, Ely never received one of these bonuses. In fact, Ely claims that the bonuses were based on criteria that made them virtually unobtainable. Defendant has failed to demonstrate that the bonus structure was a legitimate means for Ely to increase his earning capacity. Furthermore, Defendant has failed to meet their burden under this factor; accordingly, this favor weighs in favor of Plaintiff, and summary judgment must be denied.[13]

### III. CONCLUSION

Having weighted the above factors, the Court finds that Defendant has failed to meet its burden under its affirmative defense that Ely "fit plainly and unmistakenly within the exemptions terms and spirit" of the FLSA. *Spinden,* 94 F.3d at 426. Accordingly, Defendant's Motion for Summary Judgment (ECF No. 41) must be **denied.** Defendant's Motion to Strike and Objections to Evidence Offered in Opposition to Defendant's Motion for Summary Judgment (ECF No. 57) is **denied.**

**IT IS SO ORDERED.**

---

12. Defendant also requests this Court to compare Plaintiff's salary with that of an average clerk, an employee entrusted with no managerial, or exempt, tasks. These clerks made between $6 and $7.50 per hour. Taking the $7.50 proffered by the Defendant, the clerk would make $300 for a 40–hour work week. This clerk would be entitled to time and a half for hours worked in excess of 40. Therefore, a clerk would make an additional $281.25 for working the 25 hours of overtime that Plaintiff averaged each week. In total, then, an entry level clerk would make $581.25 if he or she worked the 65 hours expected of Ely. Taking this $581.25 and comparing it to Ely's weekly $679.81, Plaintiff was making only 17% more (or 1.17 times more) than a clerk. Therefore, this additional consideration does not alter the above analysis.

13. Because Defendant has failed to demonstrate the "primary duty" factor required under both the pre-2004 and post-2004 test, the Court need not independently consider the hiring and firing factor required under the post-2004 test.